**STATE OF TEXAS, Petitioner,**

v.

**UNITED STATES of America, and Interstate Commerce Commission, Respondents.**

No. 87–4725.

United States Court of Appeals, Fifth Circuit.

March 6, 1989.

Robert Ozer, Anne Swenson, Asst. Attys. Gen., Gen. Litigation, State & County Affairs Div., Austin, Tex., for petitioner, State of Tex.

Victoria H. Tobin, Asst. Atty. Gen., Hugh Jeffrey Lanier, Atlanta, Ga., for amicus curiae, State of Georgia.

Robert S. Burk, Gen. Counsel, ICC, Michael L. Martin, Edwin Meese, III, Atty. Gen., U.S. Dept. of Justice, Robert B. Nicholson, John P. Fonte, Dept. of Justice, Laura Heiser, Washington, D.C., for the U.S. and ICC.

Jerry Prestridge, Austin, Tex., for Merchants Fast Motor Lines.

Hugh T. Matthews, Dallas, Tex., for Steere Tank Lines and Great Werstern Trucking.

Byrd R. Latham, P. Michael Cole, Asst. Attys. Gen., Athens, Ala., for Alabama Public Serv. Com'n.

Robert J. Higgins and Harriet Grant, Washington, D.C., for Intern. Broth of Teamsters, etc.

Keller & Heckman, Terrence D. Jones, Washington, D.C., for Nat'l American Wholesale.

William P. Jackson, Jr., Jackson and Jessup, Arlington, Va., for Armstrong and Reeves Transp. Co. of Georgia.

Kevin M. Williams, Gen. Counsel, Alexandria, Va., for Regular Common Carrier Conference.

Paul Rogers, General Counsel, Charles D. Gray, Assoc., Washington, D.C., for Nat. Ass'n of Regulatory Utility Com'rs.

Phillip Robinson and Mert Starnes, Austin, Tex., for Cent. Freight Lines.

William F. Pugh, Alexandria, Va., for Nat. Mtr. Freight Traffic Ass'n.

Robin A. McHugh, Helena, Mont., for State of Montana.

James T. Quinn, J. Calvin Simpson, and Janice E. Kerr, San Francisco, Cal., for Public Utilities Com'n of State of Cal.

Before THORNBERRY, RUBIN and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN and PATRICK E. HIGGINBOTHAM, Circuit Judges: *

Armstrong World Industries ships carpet from Georgia to a Texas warehouse. After a storage period, Armstrong ships the carpet onward from the warehouse to final destinations throughout Texas and in neighboring states. The ICC has issued a declaratory order holding that the carpet bound for Texas destinations moves in interstate commerce during its warehouse-to-destination trip. Texas wishes to regulate that trip, and challenges the ICC order on appeal. Texas asks us to hold that the ICC order is not final and hence unreviewable; that the ICC had no jurisdiction to enter the order; or, alternatively, that the ICC order must be reversed or vacated for both substantive and procedural defects. Finding no error, we deny the petitions to review and set aside the ICC's order.

## I

### A. Nature of the Dispute

This complex case arises out of a discrepancy between interstate and intrastate trucking rates in Texas. Interstate trucking rates, regulated by the ICC, are cheaper. E & B Carpet Mills, a division of Armstrong World Industries, ships carpet from Georgia to a warehouse it owns in Arlington, Texas. E & B would like to transport carpets from the Arlington warehouse to E & B customers throughout Texas at interstate rates. Texas and various local transport firms would like to force E & B to use state-licensed carriers, charging the higher intrastate rates, on its runs out of the Arlington warehouse. Shippers, truckers, state regulators, and federal agencies have litigated similar wrangles over "hub-and-spoke" distribution systems for at least sixty years. *See, e.g., Atlantic Coast Railroad v. Standard Oil of Kentucky,* 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927); *Public Service Comm'n v. Wycoff,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952).

This regulatory dispute turns upon whether the carpet "moves in interstate commerce" when it leaves the Arlington warehouse. Not surprisingly, both Texas and the ICC covet jurisdiction to adjudicate the meaning of "interstate" transportation in the first instance. Texas has initiated state court proceedings against E & B and Reeves, as is described in more detail below. Before those proceedings began, Armstrong went to the ICC and successfully sought a declaratory judgment construing the contested transport to be "interstate." Texas in this suit seeks, in essence, either to mitigate on jurisdictional grounds any preclusive effect that the ICC ruling might otherwise have, or to have the ICC order reversed or vacated despite the absence of any *jurisdictional* infirmity. The juxtaposition of these substantive and jurisdictional disputes puts Texas in the very

---

* Judge Higginbotham is the author of parts I, II, and III of this opinion. Judges Thornberry and Rubin join in these parts. Judge Rubin is the author of Parts IV and V of the opinion in which Judge Thornberry joins. Judge Higginbotham dissents from Parts IV and V and from the judgment.

unusual position of appealing an ICC order to this court while maintaining, among other things, that we lack jurisdiction to hear the appeal.

## B. The Distribution System

E & B Carpet Mills manufactures carpets in Dalton, Georgia, and Winchester, Tennessee. E & B ships the carpet manufactured in Tennessee to Dalton, where the carpet is stored for later distribution. In order to serve its Texas customers, E & B has since 1969 maintained a service center in Arlington, Texas. E & B ships carpet from Dalton, Georgia, to this Arlington "hub," and then transports the carpet from Arlington to Texas customers (and to some customers in adjacent states) to meet demand.

Because the interstate or intrastate character of the Arlington-to-customer leg of E & B's distribution scheme depends upon E & B's "fixed and persisting" intent, or lack thereof, at the time the carpet leaves Dalton, the precise details of the shipping arrangement are important. About 31% of the carpet leaving Dalton for Arlington is designated at departure for a specific customer. The parties refer to such carpet as "sidemarked." The remainder is "non-sidemarked." The parties agree that the sidemarked carpet is in interstate commerce until it reaches the ultimate customer.

The non-sidemarked carpet usually sits in Arlington for between two to three months before being shipped on to customers. Over 90% of the carpet shipped to Arlington eventually goes to customers within Texas. Approximately 40% of the non-sidemarked is cut in Arlington pursuant to customer order before being shipped from Arlington. The non-sidemarked carpet is shipped from Dalton to Arlington on the basis of E & B's projections from its past dealing with its "major customers," who account for 80% of E & B's overall sales.

The transport arrangement that provoked this case developed after E & B's business at its Arlington service center declined. The center used to handle nearly 70% of E & B's transactions with Texas customers, but now handles only 35% of those transactions. This amount is 3% of E & B's sales nationwide.

In order to counteract the decline in the Arlington center's business, E & B developed a program under which it would quote customers a delivered rate for its carpet, a rate which would include the freight charges from Dalton to the customer. E & B initiated this program in June of 1984. Because E & B found that intrastate trucking rates were high, E & B employed Reeves Transportation Co. of Georgia, an interstate trucking firm specializing in the transport of carpet, to carry the carpet from Arlington at interstate rates. The Texas rates were about 38% higher than the interstate rates.

In order to take advantage of Reeves' interstate rates, E & B marks its carpet as slated for "storage-in-transit." The mark is made pursuant to the "storage-in-transit" provision in Reeves' tariff: Item 910 in tariff ICC REEV 225. The effect of this marking is to designate the carpet as remaining "in transit" while it sits in the Arlington warehouse, so that the Dalton–to–Arlington–to–customer journey is regarded as one, continuous trip. Adding the "storage-in-transit" mark to the shipments apparently involves no cost to E & B, and has no effect on the handling of the goods shipped.

When the non-sidemarked carpet leaves Dalton, the bill of lading lists "Arlington" as the destination. Sometimes E & B employs Reeves to ship the carpet from Dalton to Arlington, but sometimes it uses other rail or motor carriers. All of the carpet, however, travels pursuant to the Reeves "storage-in-transit" mark.

Reeves presently handles approximately 14 percent of the traffic *out* of the Arlington hub bound for points outside the Dallas–Ft. Worth commercial zone. Approximately 32 percent of the carpet carried by Reeves from Arlington is bound for Texas destinations. The remaining 68 percent goes to out-of-state customers. Affidavit of William F. Johnson, Vice President of Reeves Transportation, at 3. The record does not indicate how much of the carpet carried by Reeves to Texas buyers is non-

sidemarked. E & B apparently would like to ship more carpet out of Arlington via Reeves, but Reeves lacks the capacity. E & B cannot find any other interstate trucking firm willing to take the work. *Armstrong World Industries, Inc.—Transportation within Texas*, Docket No. MC–C–10963 (August 25, 1987) at 4–5.

The rest of the carpet shipped from Arlington moves on local carriers. All of the carpet moving to the Dallas–Ft. Worth metropolitan area, where Arlington is located, moves via local carriers. Approximately 85 percent of the shipments within the Dallas–Ft. Worth area move via Viking Freight Service, an unregulated, inexpensive local carrier. The shipments on Viking move pursuant to E & B's "prepaid freight" program. Customer pickups and transport by customer-selected carriers account for the remaining 15 percent of the shipments within the Dallas–Ft. Worth area. Affidavit of John S. Pokrifcsak, Vice President of E & B Carpet Mills, at 8–9. In addition, 86 percent of the carpet shipped from Arlington to Texas points outside the Dallas–Ft. Worth commercial zone travels on intrastate carriers at intrastate rates.

When Reeves carries carpet from Arlington, the bill of lading lists "Arlington" as the initiation point. That bill of lading does not include any cross reference to the bill of lading that governed the carpet's movement from Dalton to Arlington. The second bill does, however, refer to the carpet's date of arrival in Arlington. E & B and the ICC claim that by using this date and a computer directory of shipping records, E & B and Reeves can match up incoming carpet shipments with outgoing shipments. E & B and the ICC claim that they do so match up shipments. Texas and the various intervenors hotly contest this point, both on the grounds of possibility and on the grounds of actual practice.

### C.  Procedural History

Armstrong sought declaratory judgment from the ICC when, in March of 1985, Armstrong discovered that Texas had commenced an investigation of Reeves. Reeves joined in Armstrong's petition. Af-

ter Armstrong filed its petition, Texas filed a state court prosecution action against Reeves. Texas also intervened in the ICC proceedings, where it unsuccessfully sought a stay of those proceedings pending the outcome of its state court action. In 1986, the ICC ruled that the contested shipments were interstate. *Armstrong World Industries, Inc.—Transportation within Texas*, 2 I.C.C.2d 63 (1986). On the basis of this ruling, Armstrong moved in federal district court for an injunction barring Texas from pursuing its state court action against Reeves and for damages under § 1983. The ICC intervened on Armstrong's behalf. The district court refused the injunction. No appeal was taken. One year later, the ICC again moved for an injunction, this time on its own initiative. The briefs do not reveal the status of this second attempt to bar the state court proceedings.

In October of 1985, Armstrong's counsel exchanged letters with the ICC counsel. Armstrong sought the ICC's intervention of the Texas state court proceedings. The ICC declined to intervene, preferring a federal forum. Exhibit 45, Appellant's Record Excerpts. Texas now claims that this exchange of letters constitutes impermissible *ex parte* communications. Texas further claims that the ICC and Armstrong impermissibly exchanged drafts of pleadings for the August 1986 § 1983 suit against Texas.

While the first (Armstrong's) district court motion to stay the state court proceedings was pending, Texas, together with Central Freight Lines, Red Arrow Freight Lines, and the Alabama Public Service Commission, moved to reopen the ICC proceedings which declared Reeves' shipments from Arlington to be interstate in character. The motion to reopen was denied in August, 1987. *Armstrong, Inc.—Transportation within Texas*, No. MC–C–10963 (1987). Texas then appealed the original ICC determination to this court. That is the case now before us.

### II

#### A.  Finality

If the ICC order is not final and hence not reviewable, we should decline jurisdic-

tion on that ground rather than resolving complex questions about the ICC's jurisdiction. Texas relies heavily on two cases, *City of Miami v. Interstate Commerce Commission*, 669 F.2d 219 (5th Cir. Unit B 1982), and *Public Serv. Comm'n. v. Wycoff*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952). Neither case will sustain a general rule holding that ICC declaratory judgments construing the scope of an interstate certificate are advisory, not final, or in any other respect not reviewable.

*Wycoff* dealt with a "hub" distribution system very similar to that contested here. Utah allegedly threatened to prosecute the trucker handling the hub-to-customer shipments for failure to obtain an intrastate license. The trucker sought declaratory judgment holding his license authorized the contested transport, but proceeded in federal district court, pursuant to 28 U.S.C. § 2201, rather than proceeding before the ICC. The court dismissed for want of a case or controversy. The case or controversy requirement does not restrict an agency's authority to issue declaratory rulings under 5 U.S.C. § 554(e) (authorizing agencies to "issue a declaratory order to terminate a controversy or remove uncertainty").

In *City of Miami*, a panel of the soon-to-be-Eleventh Circuit held a particular ICC declaratory judgment not reviewable because it did not determine any "rights or obligations." The ICC order in question construed a terminal facility, which was the subject of municipal condemnation proceedings, to be a "line of railroad." The court held that the order was better regarded as advisory, rather than declaratory, because the issue of the facility's status should be litigated before the ICC in connection with an application to abandon service, 669 F.2d at 221–22. The court specifically noted that its decision applied to this particular declaratory order, and did not imply that ICC declaratory orders in general were not reviewable. *Id.* at 222.

■ ICC orders are clearly reviewable when those orders affect the rights of the parties, or when the rulings touch "vital interests of carriers and shippers." *Fro-*

*zen Food Express, Inc. v. United States*, 351 U.S. 40, 44, 76 S.Ct. 569, 571, 100 L.Ed. 910 (1956); *Weinberger v. Hynson, Wescott & Dunning*, 412 U.S. 609, 625–27, 93 S.Ct. 2469, 2480–82, 37 L.Ed.2d 207 (1973). The ICC characterizes its declaratory order as intending "to do no more than determine the legal consequences of the factual predicate presented by Armstrong and Reeves." ICC Brief at 36. The order does not purport "to determine whether every individual shipment has moved lawfully in interstate commerce pursuant to Reeves' certificate." *Armstrong II*, No. MC–C–10963 at 8. As a result, the order would not protect Reeves from a state law regulatory proceeding if Texas were to prove facts different from those supposed by the declaratory order. This possibility does not, however, detract from the finality of the order, for it does not imply that the order settles no rights. The order assures Reeves that if it can prove a certain set of facts, Reeves may reasonably rely on its interstate certificate as authorization for its actions. As such, the order settles rights and removes uncertainty as contemplated by the Administrative Procedure Act.

■ In summary, the ICC's declaration regarding Reeves' transport authority is final and reviewable if it determines the rights of Reeves and other parties to the declaratory hearing. The declaration will affect those rights unless the ICC was without jurisdiction to issue the order, or unless the issues addressed by the declaration order will be dispositively settled by a later ICC proceeding. Thus if the order here is not reviewable, it is unreviewable only because the ICC lacks jurisdiction to adjudicate the scope of interstate commerce, or because Armstrong acted prematurely at the time it sought ICC judgment. With *Wycoff* and *City of Miami* properly understood, the finality issue thus becomes intertwined with the jurisdictional questions discussed below.

## B. ICC Jurisdiction

■ Texas contends that the ICC lacked jurisdiction to issue the declaratory order sought by Armstrong. To resolve this jur-

isdictional issue, we must determine the breadth of the Supreme Court's holding in *Service Storage & Transfer Co. v. Virginia,* 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959), wherein the Court decided that the ICC had primary jurisdiction over certain disputes about the scope of ICC certificates. In *Service Storage,* a Virginia trucker operating pursuant to an ICC license was transporting goods from a Virginia initiation point, to a West Virginia gateway, and then back into Virginia to a Virginia destination. Virginia commenced criminal proceedings against the carrier for conducting intrastate trucking without a Virginia license, claiming that the West Virginia border-crossings were merely a device for evading state jurisdiction. After Virginia began its proceeding, but before Virginia rendered a decision, the trucker sought and obtained an ICC judgment construing the trucker's certificate to authorize the contested travel. The Virginia State Supreme Court affirmed the trucker's state law conviction, and the United States Supreme Court unanimously reversed, saying,

> It appears that interpretations of federal certificates of this character should be made in the first instance by the authority issuing the certificate and upon whom Congress has placed the responsibility of action. The Commission has long taken this position ... conflicts [between state and national authorities] can best be avoided if the interpretation of I.C.C. certificates is left to the Interstate Commerce Commission.

359 U.S. at 177–78, 79 S.Ct. at 718.

Texas attempts to distinguish *Service Storage* by arguing that, while there was no doubt that the shipments in *Service Storage* crossed state lines, the shipments in this case are "on their face *intrastate.*" This argument fails. By directing attention to the character of the shipments involved, Texas invites us to decide the jurisdictional issue by pre-judging the substantive question. *Service Storage* expressly states that "interpretations of federal certificates" should be made by the issuing agency. A judgment about the superficial merits of a claim goes to the proper disposition of the claim, rather than to jurisdic-

tional authority to dispose of the claim at all.

In any event, the issues in *Service Storage* and this case are not as distinct as Texas argues. In both cases, there is no doubt that the goods being transported have crossed state lines: in this case, the lines are the various borders between Dalton and Arlington; in the earlier case, the line was the Virginia/West Virginia border. In both cases, the issue is whether the undisputed border crossings suffice to make certain portions of the journey—within Texas in this case, within Virginia in the earlier one—interstate rather than intrastate.

The brief of intervenor the Teamsters Union makes a related argument for narrowing the principle of *Service Storage.* The Union claims that in *Service Storage* the ICC was interpreting the language of the certificate, rather than the scope of interstate commerce, because the transport at issue in *Service Storage* crossed the West Virginia state line and so was clearly interstate. The Union contends that the ICC should have jurisdiction to interpret the scope of the certificate it issues, but not to adjudicate the limits of its own jurisdiction. This argument, however, cannot be reconciled with the Supreme Court's description of the issues in *Service Storage.* The Supreme Court said the ICC certificate "on its face covers the whole operation," 359 U.S. at 177, 79 S.Ct. at 718; the crucial issue that divided Virginia and the ICC was whether or not the transport was in fact intrastate rather than interstate. 359 U.S. at 178, 79 S.Ct. at 718.

This circuit's decision in *Merchants Fast Motor Lines, Inc. v. ICC,* 528 F.2d 1042 (5th Cir.1976), further diminishes whatever force Texas' arguments might otherwise have. Merchants and the State of Texas sought to contest an ICC order authorizing an interstate carrier, Whitfield, to transport goods over a route from Dallas to El Paso, entirely within Texas. Whitfield had previously used a route that was geographically interstate: the previous route crossed into New Mexico. The ICC endorsed the more direct route as a "perma-

nent alternative route." As in this case, Texas, joined by the competing carrier, challenged the ICC's jurisdiction. Texas claimed that because the Dallas to El Paso route was entirely within Texas, the ICC could not authorize transport over that route. We rejected this argument, reasoning that traffic on a route may be interstate in character even if the route itself is geographically intrastate. 528 F.2d at 1044. Moreover, we explained that if Merchants believed that the traffic on the route was in fact intrastate, the proper forum for Merchants's complaint was the ICC. 528 F.2d at 1045. Texas brings precisely the same jurisdictional challenge in this case, and the challenge meets the same fate. The fact that a route is geographically intrastate does not imply that traffic on the route is intrastate in character, and the character of the traffic is a question within the ICC's primary jurisdiction.

Texas does not cite any cases to support its interpretation of *Service Storage,* and the cases it cites on the more general topic of the ICC's jurisdiction fail to narrow or undermine the *Service Storage* rule. *Louisiana Public Service Commission v. Federal Communications Commission,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), reviewed an FCC order declaring that federal law pre-empted state regulation of depreciation of telephone company property. The Communications Act of 1934 authorized the FCC to regulate interstate telecommunications while preserving local authority over intrastate telecommunications. The resulting division of authority is very complex, since telephone lines, switchboards, and similar equipment are used for both interstate and intrastate communications; telephone lines are not so much interstate *or* intrastate in character, as they are *both.* In the order contested in *Louisiana Public Service,* the FCC claimed exclusive authority to regulate the depreciation of facilities, arguing that allowing states to regulate depreciation of those facilities would undermine FCC policy.

A Fourth Circuit panel affirmed the FCC order, but the Supreme Court reversed, holding that the Act expressly barred the FCC from regulating the intrastate aspect of telecommunications. But the Court did not hold that the FCC lacked authority to determine, in the first instance, how much of a particular facility was interstate, rather than intrastate. Indeed, the Court observed that the Communications Act expressly provided for a process, governed by federal law, for resolving disputes about the distinction between interstate and intrastate telecommunications. 47 U.S.C. § 410(c); *see Louisiana Public Service,* 106 S.Ct. at 1902. In this case, we do not deal with an attempt by the ICC to regulate anything that the ICC itself concedes to be intrastate commerce: rather, the ICC claims that the contested commerce at issue here is interstate, not intrastate. If the ICC has mistakenly or deliberately misconstrued the distinction so as to expand its own jurisdiction, that is a substantive, rather than a jurisdictional, defect in its treatment of Armstrong's petition.

In the end, Texas' use of *Louisiana Public Service* turns upon the same erroneous premise that governed its interpretation of *Service Storage.* Texas claims that the ICC is trying to regulate intrastate commerce because Reeves' trips from Arlington are "facially" or "manifestly" intrastate. Texas is trying to put the cart before the horse: these arguments go to the substance, rather than the jurisdictional basis, of the ICC decision.

Texas also relies again on *Public Service Commission v. Wycoff,* 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952). Texas quotes a passage from that opinion, saying:

> It is the state courts which have the first and last word as to the meaning of the state statutes and whether a particular order is within the legislative terms of reference so as to make it the action of the State.

344 U.S. at 247, 73 S.Ct. at 242. *Wycoff* is distinguishable on several grounds. First, as already mentioned, it dealt with the "case or controversy" requirement applicable to petitions for declaratory judgment in the federal courts, rather than in federal agencies. Second, the quoted passage refers to "state statutes." Third, to the ex-

tent that one may draw inference from *Wycoff* about the ICC's authority, those inferences are dicta only; the issue of the ICC's authority vis-a-vis the states was clearly presented in the later *Service Storage* case.

We therefore hold that *Service Storage* governs this case. The Eighth Circuit recently reached the same conclusion. *Middlewest Motor Freight Bureau v. ICC*, 867 F.2d 458 (8th Cir.1989).

■ Once the authority of *Service Storage* is recognized, the only remaining jurisdictional issue arises out of the question as to when the federal licensee should appropriately petition the ICC for judgment. In *Service Storage* the trucker petitioned for an ICC interpretation of its license after Virginia initiated proceedings against it; here, Armstrong sought declaratory judgment before the state court action was filed. Yet to require that Armstrong delay its petition to the ICC until Texas begins a prosecution would frustrate the purposes of the Administrative Procedure Act, 5 U.S. C. § 554(e), which authorizes agencies to issue declaratory orders to settle controversies or remove uncertainty. The effect of such a rule would be to perpetuate ambiguity and increase the potential liabilities of interstate carriers. Because the ICC will have primary jurisdiction to adjudicate the scope of an ICC certificate, nobody is disadvantaged by permitting a carrier (or shipper) to obtain the judgment of the ICC as soon as it became clear that a state regulator disputes the carrier's own interpretation of its license.

### III

We first dispose of three challenges to the procedural integrity of the ICC proceedings. Texas raises two arguments. Texas asks us to vacate the ICC's order on the ground that the ICC was biased, or alternatively on the ground that the ICC received improper *ex parte* communications from Armstrong. Both of these arguments arise out of litigation in which the ICC sought to preserve its jurisdiction to decide the character of the contested trans-

port in this case. We find no merit in the arguments advanced by Texas.

■ On the issue of bias, Texas contends that the ICC's participation in Armstrong's § 1983 suit, intended to halt and obtain damages for a Texas regulatory proceeding, created both an appearance of bias and actual bias. Texas's position overlooks two crucial points: the difference between judicial and administrative adjudicators, and the distinction between jurisdictional and substantive issues in this case. First, agencies, unlike judges, actively formulate and defend the policies which inform their adjudications. The presence of the ICC as a party litigant in this appeal testifies to this difference: one could not imagine a district judge appearing to argue the merits of her decision, but it is reasonable, and common, for a government agency to argue the merits of its own opinion on appeal. To say (as the logic of Texas's argument would force us to do) that the ICC's appearance before this Court would eliminate the possibility of a remand—because the ICC is biased by its own legal argument— would frustrate the entire system of administrative adjudication. The modern regulatory agency occupies an uneasy position under a Constitution that recognizes only three distinct branches, but a comprehensive challenge to the agency's constitutional station, even if not foreclosed by Supreme Court precedent, cannot go forward disguised as a more specific argument about bias.

■ Second, even if we were able to recognize bias of the form Texas describes, it would not exist in this case. The ICC may protect its own jurisdiction to decide the character of commerce without prejudicing the exercise of that jurisdiction. The argument urged by Texas again assumes that because the route travelled by the carpet is geographically intrastate, the ICC's effort to exercise jurisdiction is itself an endeavor to regulate intrastate commerce and so presupposes a judgment upon the nature of the commerce. This reasoning is doubly confused. The jurisdictional question is about who decides whether the commerce is interstate, not about whether

the commerce is in fact interstate. The substantive question, to be decided by whatever body has jurisdiction, is whether the commerce is interstate in character. The fact that the route travelled is geographically intrastate is completely irrelevant to the first question, and far from dispositive of the second.

■ Texas fares no better on the *ex parte* communications point. As Texas recognizes, an *ex parte* communication is prohibited by the Administrative Procedure Act only if the communication is "relevant to the merits of the proceeding." *See* 5 U.S.C. § 557(d). For the reasons explained above, we agree with the ICC that no *ex parte* communications took place, because all of the allegedly *ex parte* communications dealt with the jurisdictional issues, rather than with the merits. Texas raises other serious objections to the characterization of the communications as *ex parte* communications. We do not need to reach these arguments, and express no opinion upon them.

Not surprisingly, Texas cites no case, either dealing with *ex parte* communications or dealing with agency bias, that is factually similar to this case. Texas relies heavily on *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), where a state optometry board was disqualified, because of bias, from conducting a review proceeding after having filed and lost a state court action against the optometrists subject to the review proceeding. *Gibson* is easily distinguishable from this case. First, the state board was composed entirely of practicing optometrists with personal financial interests directly adverse to those they proposed to review. The Supreme Court upheld the injunction against the board proceeding on this ground alone, without reaching the possibility of bias resulting from the earlier state court action. 411 U.S. at 578–79, 93 S.Ct. at 1698. Second, the state suit filed by the board was a purely substantive challenge to the practice of some optometrists, not an attempt to protect the board's own jurisdiction (indeed,

the board stayed its own proceeding in order to file the suit).

■ An intervenor, the Texas Intrastate Carriers, raises a third procedural objection. The Carriers contend that the ICC erred by failing to provide an oral hearing and allow for the cross-examination of witnesses. We disagree. The Supreme Court has concluded that the term "hearing" as used in the Administrative Procedure Act "does not necessarily embrace either the right to present evidence orally and to cross-examine opposing witnesses, or the right to present oral argument to the agency's decision-maker." *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 240, 93 S.Ct. 810, 818, 35 L.Ed.2d 223 (1973). In the proceedings we now review, the ICC, by its own description, determined the legal significance of a fact pattern presented by Armstrong and Reeves. The ICC did not determine whether any particular shipment conformed to that fact pattern. Under these circumstances, we believe that the "paper hearing" conducted by the ICC provided all parties with adequate opportunity to comment, and so conformed to the APA's hearing requirements.

## IV

### A.

The ICC's declaratory order was issued after an informal adjudication [1] pursuant to the authority conferred by 5 U.S.C. § 554(e) to "issue a declaratory ruling to terminate a controversy or remove uncertainty." Rendered in a specific factual context and resolving only the question presented by Armstrong's and Reeves's petitions, it "belongs to the genre of adjudicatory rulings." [2]

■ Although the intervenors suggest that we apply various more exacting standards of review, such adjudications are subject to judicial review only to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in

1. *Armstrong World Industries, Inc.*, 2 I.C.C.2d 63, 75 (1986).

2. *Loveday v. Federal Communications Comm'n*, 707 F.2d 1443, 1447 (D.C.Cir.), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 525, 78 L.Ed.2d 709 (1983).

accordance with law." [3] This gives us no license to substitute our own opinion for the ICC's, but limits our inquiry to considering whether its conclusions are rationally supported.[4] More activist and intrusive review would increase judicial control of the independent agency's adjudicatory function, violating the precepts of the APA and trenching on the role in regulating interstate commerce that Congress imparted to the ICC.

## B.

The challengers accept the ICC's general approach to determining whether goods move in interstate or intrastate transit. As the ICC has stated, "It is well settled that characterization of transportation between two points in a State as interstate or intrastate in nature depends on the 'essential character' of the shipment. Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting *intent at the time of shipment.*" [5] What the challengers contest is the relative importance the ICC gave to various facts and circumstances surrounding the transportation in ascertaining the shipper's fixed and persisting intent.

The ICC began its analysis by recognizing that the presence of common incidents of through carriage, such as through billing, uninterrupted movement, continuous possession by the carrier, or unbroken bulk, may indicate an interstate shipment. However, it explained that the presence of these elements is not a prerequisite to characterizing the movement as interstate. It found the existence of a transit privilege under which the traffic moves, though not dispositive, to be a strong indication of the character of a movement, diminishing the relative significance of the other factors.

After analyzing its own decisions and various opinions of the Supreme Court and federal circuit courts, the ICC concluded that Armstrong intended, at the time the carpet left Dalton, Georgia, to move it to destinations beyond the Arlington warehouse, destinations that involved an interstate movement from the point of shipment. Relying on the fact that the carpet moved under Reeves's storage-in-transit provision and that it was not "processed or commingled in any way to cause it to lose the identity it had when it left Dalton," the ICC found the transportation of non-side-marked carpet by Reeves within Texas under Reeves's storage-in-transit provision to have been part of a continuous interstate movement.[6] The ICC noted, but found unimportant, that the ultimate destination and consignee of each particular Armstrong shipment was not known at the time the carpet left Georgia, separate bills of lading were issued for the prior and subsequent movements of the carpet, the carpet returned to Armstrong's possession at the Arlington warehouse, and some of the carpet was cut at the warehouse.[7]

The intervenors claim that the ICC's order is inconsistent with federal decisions and the ICC's cases. An agency, however, is not bound by the shackles of stare decisis to follow blindly the interpretations that it, or the courts of appeals, have adopted in the past.[8] When, as here, an agency purports to follow earlier judicial constructions of the Act, we review only whether its interpretation of the precedents is reasonable. The question is not whether we would construe the precedents as the ICC did, but whether its con-

---

**3.** 5 U.S.C. § 706(2)(A); *see Middlewest Motor Freight Bureau v. ICC,* 867 F.2d 458, 460 (8th Cir.1989); *Loveday,* 707 F.2d at 1447–48; *see also Pennsylvania Pub. Util. Comm'n v. United States,* 812 F.2d 8, 10 (D.C.Cir.1987).

**4.** *See United States v. Allegheny–Ludlum Steel Corp.,* 406 U.S. 742, 749, 92 S.Ct. 1941, 1946, 32 L.Ed.2d 453 (1972).

**5.** *Armstrong,* 2 I.C.C.2d at 69 (emphasis added) (citing *Texas & N.O.R. Co. v. Sabine Tram Co.,* 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913) and *Baltimore & O.S.W.R. Co. v. Settle,* 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189 (1922)).

**6.** *Armstrong,* 2 I.C.C.2d at 74.

**7.** *Id.*

**8.** *See Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 863–64, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984).

struction is a tenable one. Similarly, although agency actions, as distinguished from adjudicatory decisions, are not precedents in the sense of being binding authority, when an agency departs from what it has previously done, it must acknowledge the difference and explain its departure.[9]

The intervenors' primary contention is that the ICC placed undue importance on Reeves's storage-in-transit provision in determining that the trip from Arlington to the ultimate Texas destinations was interstate in nature. They argue that several other factors deserve consideration in determining the interstate nature of a hub-to-spoke trip, but that the ICC treated a single factor, the storage-in-transit provision, as dispositive. Furthermore, they urge us to find that because the final destination was not known at the time the carpet left Georgia, Armstrong could not have intended that the trip from the Arlington warehouse to the final Texas destination to be interstate.

The intervenors rely on the Supreme Court decision in *Atlantic Coast Line Railroad Company v. Standard Oil of Kentucky,*[10] and other Supreme and circuit court decisions [11] for the broad proposition that before a shipper can intend that goods move continuously in interstate commerce, the shipper must know their final destination. None of these cases, however, involved storage-in-transit arrangements. As the ICC explained, these decisions are therefore not relevant, or, at least, not dispositive, when, as in Armstrong's case, the shipment is pursuant to a storage-in-transit provision.[12] The ICC supported this distinction by noting that in *Surles v. Con-*

*tract Carriers Application,* it had specifically pointed out that the case did not involve " 'joint rates, ... provisions for storage in transit, or any other arrangements between the carriers for a continuous shipment from origin points to any place beyond the point of [initial] delivery.' " [13] Other ICC decisions also refer to the lack of any through arrangement or method involving continuity of transportation.[14] Thus the ICC reasonably distinguished between two lines of cases—those involving storage-in-transit provisions and those that did not.

Furthermore, in *Atlantic Coast Line* the shipments were to warehouses run by local, independent wholesalers, who themselves designated the final destination of the cargo.[15] The Supreme Court explained the importance of this fact in determining whether shipments out of the warehouse were the continuations of an interstate movement:

> Neither the sellers, who deliver the oil, nor the railroad company, that aids the delivery of the oil to the storage tanks and tank cars at the seaboard, has anything to do with determining what the ultimate destination of the oil is.... [16]

In contrast here, E & B, the out-of-state shipper, determines the final destination.

In *Baltimore & O.S.W.R.R. Co. v. Settle,*[17] the Supreme Court found transit privileges strong evidence of the shipper's intention to ship goods in interstate transit despite the presence of a storage interval and the absence of other customary incidents of that intent, such as through billing, uninterrupted movement, continuous

9. K. Davis, 4 Administrative Law Treatise § 20:11 (1983); *cf. Frozen Food Express, Inc. v. United States,* 535 F.2d 877, 880 (5th Cir.1976).

10. 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927).

11. *E.g., Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943); *Burlington Northern, Inc. v. Weyerhaeuser Co.,* 719 F.2d 304 (9th Cir.1983); *Determination of Jurisdiction Over Transportation of Petroleum & Petroleum Products by Motor Carriers Within a Single State,* 71 M.C.C. 17 (1957); *Surles Contract Carrier Application,* 4 M.C.C. 488 (1938).

12. *Armstrong,* 2 I.C.C.2d at 70.

13. *Id.* (quoting *Surles,* 4 M.C.C. at 494).

14. *See e.g. Petroleum Products,* 71 M.C.C. at 20.

15. *See also Mitchell v. Livingston & Thebaut Oil Co.,* 256 F.2d 757 (5th Cir.1958).

16. *Atlantic Coast Line,* 275 U.S. at 269, 48 S.Ct. at 111.

17. 260 U.S. 166, 171, 43 S.Ct. 28, 30, 67 L.Ed. 189 (1922).

possession, or unbroken bulk.[18] The Court stated, "in many cases involving transit or reconsignment privileges in blanket territory, most or all of these incidents are absent and yet through interstate tariffs apply."[19] As the ICC noted, "the [*Settle*] Court also observed that shipments from a distribution point following an interstate movement are often deemed a separate intrastate movement *if the applicable tariffs do not confer reconsignment or transit privileges.*"[20]

The ICC also found support in its own decisions finding that the existence of appropriate transit arrangements supported the characterization of shipments in the final leg of two separate movements to be interstate.[21] In *Commercial Oil Transport Extension—Jacksonville, Ill.,*[22] the ICC relied on such transit arrangements to conclude that the wholly intrastate movement from plant to final destination was in interstate commerce. The traffic in *Commercial Oil* moved from out-of-state to a shipper's plants in Illinois, whence, after processing, it moved to other points in Illinois. The ICC explained, "shipments of this character standing alone would be regarded as separate and distinct shipments, but the existence of appropriate transit arrangements covering movements into and out of the sites of the shippers' plants is deemed to be sufficient to convert these otherwise separate movements into a through interstate movement."[23] Similar results were reached in *Commercial Oil Transport Extension—Oils,*[24] and *Oilfield Equipment To and Between the Southwest.*[25]

In *Railroad Commission of Texas v. Oil Field Haulers Association,*[26] the ICC held that pipe transported from out-of-state by motor carriers pursuant to storage-in-transit arrangements to storage yards in Texas continued to move in interstate commerce during subsequent trips from the storage yards to the ultimate Texas destinations. At the time the pipe was stored, the ultimate consignee and destination were unknown. Either the shipper or the consignee designated the ultimate destination of the pipe to the carriers, who maintained the yards. In *Armstrong,* the ICC quoted this statement from *Oil Field Haulers:*

The record clearly indicates that all the pipe does in fact move beyond the transit point, and that it is the intent of the shipper that the movement from origin to ultimate destination constitutes one continuous movement. *Merely because the exact identity of a particular consumer is unknown is of no moment.* As has often been stated, transit rests upon a fiction that the incoming and outgoing transportation services, which are in fact distinct, constitute a continuous shipment of the identical article from point of origin to final destination.[27]

The Regular Common Carrier Conference, one of the intervenors, asserts that the ICC erroneously relied on *Oil Field Haulers* because the shipments in that case never left the carriers' control and were stored in the carriers' facilities. The ICC recognized this distinction, but concluded, "The critical element is the shipper's intent at the time the goods are initially shipped, as strongly evidenced by use of the transit privilege. The ownership or control of the in-transit storage facility, with one exception to be discussed *infra,* has no bearing on the shipper's intent at the origin point."[28] The exception related to goods transported to a shipper-controlled warehouse in the same state when only part of the goods is later shipped to interstate destinations. In such cases, reasoned

18. *Id.*

19. *Id.*

20. *Armstrong,* 2 I.C.C.2d at 70 (emphasis added) (citing *Settle,* 260 U.S. at 173, 42 S.Ct. at 29).

21. *Id.*

22. 73 M.C.C. 527 (1957).

23. *Id.* at 532.

24. 76 M.C.C. 773, 777 (1958).

25. 300 I.C.C. 409, 428 (1957).

26. 325 I.C.C. 697 (1965).

27. *Armstrong,* 2 I.C.C.2d at 71 (quoting *Oil Field Haulers,* 325 I.C.C. at 701 and adding emphasis).

28. *Armstrong,* 2 I.C.C.2d at 72.

the ICC, the ownership of the transportation facility, rather than the storage-in-transit privilege, is more determinative of the nature of the transit.

The ICC recognized, but distinguished, a Ninth Circuit case that attached some significance to the ownership of the storage facility. In *Southern Pacific Transportation Company v. ICC*,[29] Del Monte shipped canned goods from California processing plants to a warehouse in Stockton, California, obviously an intrastate movement. After arriving in Stockton, some of the goods were shipped to California destinations while others were shipped across state lines. All of the goods traveled to the warehouse from the processing plants pursuant to transit privileges, enabling Del Monte to ship the goods according to the lower through rate if the goods were subsequently shipped across state boundaries. The ICC prohibited some small carriers, employed by Del Monte to transport goods on the plant-to-warehouse journey, from continuing to provide those services. The carriers lacked interstate operating authority, and the ICC determined that because the goods moved under the transit privilege, the goods were in interstate commerce even though the plant-to-Stockton trip took place entirely within California.

The Ninth Circuit set aside the ICC's order, finding that no "fixed and persisting intent" to put the goods into interstate commerce existed before the goods arrived at the warehouse, since some of the goods never left the state. "Inasmuch as it cannot be determined whether goods are committed to interstate or foreign commerce until they are shipped from the warehouse, the Commission's decision would lead to retroactive imposition of its jurisdiction, turning on whether particular goods are committed to interstate or foreign commerce upon subsequent shipment." [30]

In *Armstrong*, the ICC acknowledged that the Ninth Circuit had distinguished *Southern Pacific* from *Oil Field Haulers*

on the basis that the carriers maintained the storage yards in *Oil Field Haulers* and the shipper maintained them in *Southern Pacific*.[31] The ICC found the concern in *Southern Pacific* with control of the warehouse, however, to have been based on the fact that when a shipper controls a warehouse in the state in which the goods originate, and some never leave that state, the shipper might use interstate rates to transport goods that will never leave the state. It explained:

> This concern does not exist here, so there is no need to place dispositive emphasis on the ownership of the storage facility. None of the carpet transported to the Arlington service center has a Texas origin. Consequently, there exists no opportunity to commingle local and interstate freight. Each and every shipment from Arlington has had a prior out-of-State movement, and under the terms of the applicable tariff it must be matched with its counterpart by bill number. This distinction is sufficient to make the *Southern Pacific* case non-controlling here.[32]

This interpretation of *Southern Pacific* is reasonable. Shipments that move from a factory in state A to a warehouse in state A, when some of it is never shipped out of that state, are not analogous to shipments from state A to a warehouse in state B, when some of it later moves to final destinations within state B. In the former case, goods bound for local markets are commingled with goods bound for interstate markets, with the potential for deviously using interstate storage-in-transit privileges on the initial part of the trip. In the later case, all goods are bound for interstate markets, and there is no potential for manipulative commingling. As we have explained,

> It is well settled that, in determining whether a particular movement of freight is interstate or intrastate or foreign commerce, the intention existing at

---

**29.** 565 F.2d 615 (9th Cir.1977).

**30.** *Id.* at 620.

**31.** *Armstrong*, 2 I.C.C.2d at 73 (citing *Southern Pacific*, 565 F.2d at 619).

**32.** *Id.* at 73.

the time the movement starts governs and fixes the character of the shipment. If the shipment comes to rest *within the state of origin* and the goods are thereafter disposed of *locally,* the interstate character of the shipment is lost, but temporary stoppage within the state, made necessary in furtherance of interstate carriage, does not change its character.[33]

■ The market for all of the carpet shipped by E & B from Georgia is in another state, Texas. The fact that some of the carpet stored in Arlington will move by intrastate carriers because more interstate carriers are not available does not implicate the concern that interstate and intrastate goods are being commingled in a warehouse in order to use an interstate transit for transporting goods to a purely intrastate market. E & B intends that all its goods travel to final destinations in Texas via the storage-in-transit provision. The fact that its intent is partially thwarted because Reeves lacks sufficient equipment to handle all the traffic does not destroy Armstrong's intent with regard to the traffic actually handled by Reeves.

In *Burlington Northern, Inc. v. Weyerhaeuser Company*[34] the Ninth Circuit recognized the distinction relied on by the ICC between cases in which the initial shipment to a warehouse is from out-of-state and those in which the initial shipment is from within the same state. In *Burlington Northern,* the shipper directed goods to a warehouse within the state of origin. It then shipped most, but not all, of the goods out-of-state. The shipper did not decide the final destination until the goods reached the warehouse. *Burlington Northern* distinguished this agenda from the agenda when goods originate out-of-state, are stored until sold, and are ultimately shipped to final destinations within the

warehouse state. Thus, in *Long Beach Banana Distributors v. Atchison, Topeka & Santa Fe Railway Company,*[35] the Ninth Circuit held that the entirely intrastate leg of a trip in which the goods first crossed a state line was in interstate transit because, even though the ultimate destination was not known when the goods were initially shipped, "[t]he essential character of the transportation was foreign."[36] The *Burlington Northern* court found the distinction significant because in *Burlington Northern,* the shipper "could not designate with certainty at the [storage] yards which logs would eventually be exported."[37] Thus the Ninth Circuit's cases support the interpretation the ICC used in *Armstrong.*

Determining the existence of the requisite "fixed and persisting" intent to move goods in interstate commerce turns in significant part on factual context of each case. In *Southern Pacific,* for example, the shipper was not a party to the action. None of its employees testified about the shipper's purpose or intent and the shipper offered no evidence about its actual business practices. As a Minnesota district court has noted, "Despite rather broad dicta, the holding in *Southern Pacific* rests upon the fact that the eligibility of goods for transit privileges was insufficient evidence to establish that the essential character of the commerce in question was interstate."[38] In contrast, both the shipper and carrier were parties to the petition for a declaratory order in this case, and submitted evidence about their practices and intent in shipping carpet from Georgia.[39]

Contrary to the contention of some of the intervenors, the ICC did not decide that the use of a storage-in-transit privilege was dispositive of the interstate nature of the movement. The ICC noted that it was a "strong indication" of the through charac-

**33.** *Texas v. Anderson, Clayton & Co.,* 92 F.2d 104, 107 (5th Cir.), *cert. denied,* 302 U.S. 747, 58 S.Ct. 265, 82 L.Ed. 578 (1937).

**34.** 719 F.2d 304 (9th Cir.1983).

**35.** 407 F.2d 1173 (9th Cir.), *cert. denied,* 396 U.S. 819, 90 S.Ct. 56, 24 L.Ed.2d 70 (1969).

**36.** 719 F.2d at 310.

**37.** *Id.*

**38.** *Northwest Terminal Elevator Ass'n v. Minnesota PUC,* 576 F.Supp. 22, 30 (D.Minn.1983), *aff'd,* 725 F.2d 80 (8th Cir.1984).

**39.** *See Armstrong,* 2 I.C.C.2d at 67.

ter of a movement,[40] but relied in addition on the "incidents" surrounding the involved transportation. Without discussing them in detail, the ICC noted such indicia as the tracking and documentation linking the shipments coming in and going out of Arlington,[41] and the fact that the goods are not processed, other than being cut to specification, at the temporary storage point.[42]

■ We conclude that the ICC did not fail to follow any of its cases, nor did it unreasonably construe federal caselaw. It recognized the various cases that might suggest a different result and distinguished each case on solid ground. We find, therefore, that the ICC was not arbitrary or capricious in deciding that the movement from Arlington via Reeves carriers to final destinations within Texas was interstate in nature.

### C.

■ Finally, intervenors Central Freight Lines and Regular Common Carrier Conference contend that Reeves's transit provision is invalid because the freight involved does not move over a through route at a through rate. Because these parties did not raise this issue before the ICC, however, they are foreclosed from raising it here.[43] The language in their Supplemental Petition to Reopen in which they argued that the transit privilege was a "sham" does not constitute a claim that Reeves misused the transit privilege. Any challenge to the bona fide nature of the Reeves transit provision should be made before the ICC.

### V.

In this opinion, we have attempted to clear a path through the thicket of issues presented by the parties. To guide future travelers, we summarize our holdings.

Whether commerce is interstate, and subject to ICC regulation, or intrastate, and subject to Texas regulation, depends upon the "fixed and persisting intent" of the shipper. A carrier or shipper involved in a particular hub-and-spoke distribution system may be uncertain about the characterization of a certain movement, or a state may subject a carrier to regulatory proceedings with regard to transportation that the carrier believes to be interstate. If so, the shipper or carrier, as the case may be, may ask the ICC to determine the character of the contested transportation. That was the course taken in *Service Storage.* The ICC has primary jurisdiction to decide that question. If the ICC does so, the resulting order is final and reviewable. Upon review, we will defer to the ICC's judgment unless it is arbitrary or capricious. The ICC's order, of course, will be dispositive only as applied to the same fact pattern that formed the basis for the declaratory order. If the ICC chooses to litigate to protect its jurisdiction, its engagement does not of itself compromise the ICC's power to exercise that jurisdiction.

In this case, the ICC has applied the "fixed and persistent intent" rule reasonably in deciding that when the shipper involved transports goods across state lines to a hub warehouse pursuant to a storage-in-transit privilege, the later hub-to-customer transport was still interstate in character, even though it did not again cross state lines.

For these reasons, the petitions to review and set aside are DENIED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring in part and dissenting in part:

I join the panel majority with respect to the jurisdictional and procedural issues addressed in Parts I–III of the court's opinion. I also agree with much of what the majority says about the standard of review appealable to the ICC's ruling, and about

---

**40.** *Id.* at 69.

**41.** *Id.* at 73.

**42.** *Id.* at 74.

**43.** *See United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952); *Merchants Fast Motor Lines v. ICC,* 528 F.2d 1042, 1044 (5th Cir.1976).

the reasonableness of that ruling. Ultimately, however, I believe that the ICC's construction of the law twists precedent unreasonably. Indeed, at crucial junctures the ICC's interpretation of the Motor Carrier Act contradicts itself. The consequence of the ICC's ruling is an unjustified derogation from the federal division of regulatory power envisioned by Congress. For that reason, I dissent from Part IV of the majority opinion.

## A.  Standard of Review

The substantive issues in this case turn upon the meaning of 49 U.S.C. § 10521. Under 49 U.S.C. § 10521(a)(1)(A), the Interstate Commerce Commission "has jurisdiction over transportation by motor carrier ... to the extent that passengers, property, or both, are transported by motor carrier between a place in a State and a place in another State." The ICC also has regulatory authority over motor carrier transportation of property "between a place in a State and another place in the same State through another State," 49 U.S.C. § 10521(a)(1)(B), but the ICC's authority to regulate interstate commerce does not, with some specified exceptions, "affect the power of a State to regulate intrastate transportation provided by a motor carrier." 49 U.S.C. § 10521(b)(1).

The parties agree that Reeves holds a nationwide general commodity authority license issued by the ICC, and that Reeves may legitimately engage in the contested transportation if that transportation is in interstate commerce for purposes of 49 U.S.C. § 10521. The crucial question is whether the warehouse-to-destination leg of the carpet's journey may be integrated into the longer Georgia–to–Texas leg of the journey.

As the majority correctly observes, the general legal rules governing this issue are clear. The determination of whether a movement between two points in a single state is in interstate commerce, and so subject to ICC regulation, depends on the essential character of the shipment. The shipper's fixed and persisting intent at the outset of the transportation is the crucial factor in determining the character of a particular shipment. *Baltimore & O.S. W.R. Co. v. Settle,* 260 U.S. 166, 170, 43 S.Ct. 28, 67 L.Ed. 189 (1922). The parties dispute both the applicable standard of review and whether E & B has the requisite "fixed and persisting intent" to convert the Arlington-to-customer trips into interstate commerce.

The formula fixing our review of administrative decisions is a familiar one. "We may not set aside the Commission's decision unless it exceeds statutory authority or is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'.... Even if an agency's interpretation would not be the one we would adopt if looking at a statute completely afresh, we ordinarily accept that agency's interpretation of its own statute if the interpretation 'has a reasonable basis in law.'" *American Trucking Ass'ns, Inc. v. I.C.C.,* 722 F.2d 1243, 1247–48 (5th Cir. 1984), *cert. denied,* 469 U.S. 930, 105 S.Ct. 324, 83 L.Ed.2d 261 (1984).

The I.C.C. contends that because the Commission decision appealed from construes an operating certificate issued by the Commission, we should apply an especially deferential standard of review in this case. *See, e.g., Jenkins Truck Line, Inc. v. United States,* 318 F.Supp. 207, 209–10 (S.D.Iowa 1970) (three judge court) (deferring to ICC's construction of an ICC certificate). It is true that the ICC's declaratory order construes the scope of Reeves' operating certificate. Because Reeves has a general certificate permitting it to engage in interstate trucking, however, the ICC's order rests upon a construction of the Commission's own jurisdiction. In this case, unlike in *Jenkins,* the Commission interpreted 49 U.S.C. § 10521, rather than more particular terms included by the Commission in the Reeves operating certificate.

Nonetheless, some deference is due the Commission's decision despite our determination that the order appealed from construes 49 U.S.C. § 10521. According to the Supreme Court's opinion in *Chevron U.S.A., Inc. v. Natural Resources Defense,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694

we must honor the agency's interpretation of its statute so long as that interpretation is a reasonable one. We must uphold Congressional intent when that intent is clear, but in the absence of such clear intent, a court should "not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* 104 S.Ct. at 2781–82 (footnotes omitted). *See also Commodity Futures Trading Commission v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 3254–55, 92 L.Ed.2d 675 (1986).

No clear Congressional intention lights our path in this case. I therefore agree with the majority that we need consider only whether the ICC's interpretation of its jurisdiction is a reasonable one. *See supra,* p. 1556 & n. 8. In doing so, we benefit from the guidance of several past decisions, by both courts and the agency, applying the Motor Carrier Act to hub-and-spoke distribution systems. Because the agency purports to follow, rather than depart from, earlier judicial and administrative constructions of the Act, we need not decide whether the ICC might reasonably reject interpretations which federal courts have applied in the past. *See Chevron USA,* 104 S.Ct. at 2792 (agency not bound by interpretations which it, or the Court of Appeals, adopted in the past); *Schor,* 106 S.Ct. at 3254–55. We need only determine whether the proffered interpretation of the "hub-and-spoke" precedents, and the statute they construe, is reasonable.

### B. The Agency's General Theory

Determination of a shipper's "fixed and persisting intent" depends upon an assessment of "all the facts and circumstances surrounding the transportation." The ICC's interpretation of the "hub-and-spoke" cases gives great weight to two factors. The first factor is whether the shipper makes use of a transit privilege, such as the storage-in-transit provision in Reeves' tariff, designating the shipment as a unified, interstate journey. "The exist-

ence of a transit privilege under which the traffic moves, though not dispositive of the issue, is a strong indication of the through character of a movement, and it diminishes the significance of [other] factors." *Armstrong World Industries, Inc.—Transportation within Texas,* 2 I.C.C.2d 63, 69 (1986). The second factor is whether the shipper commingles interstate and intrastate goods at the hub. A shipper's control over a hub warehouse will not cancel the effect of a transit privilege so long as the shipper has "no opportunity to commingle local and interstate freight." 2 I.C.C.2d at 73.

This general theory makes good sense of the law. The interpretation fits well with the "fixed and persisting intent" test. When a shipper identifies goods, at the time of a shipment, as destined to cross state lines, wait at a central warehouse, and then proceed onward to a further destination, that is certainly a strong indication that the shipper has a "fixed and persisting intent" to transport the goods in interstate commerce beyond the warehouse. The transit privilege effectively testifies to the shipper's intent. That testimony, however, would be of little import if the shipper, taking advantage of its control over the hub warehouse, simply sold some of the carpet right at the warehouse. If the shipper regularly made such sales, the shipper could hardly have a "fixed and persisting intent" to ship the carpet beyond the warehouse: these later shipments would be contingent upon the shipper's inability to find a buyer at the warehouse. Together, the ICC's two factors give great weight to the shipper's contemporaneous declaration of its intent, except when the shipper's conduct is inconsistent with that intent.

The cases relied on by the parties challenging the ICC position can be reconciled with the ICC's general interpretive principles. In *Atlantic Coast Line Railroad v. Standard Oil of Kentucky,* 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927), Standard Oil of Kentucky operated a hub-and-spoke distribution system to sell gasoline in Florida. Standard Oil of Kentucky purchased the gas from Standard Oil of Louisiana. The Louisiana company shipped the gas to

Port Tampa and Jacksonville in Florida, where the Kentucky company took delivery. The Louisiana company pumped the gas into large storage facilities maintained by the Kentucky company at Port Tampa and Jacksonville. The Kentucky company would then deliver gas from the storage facilities to bulk stations throughout Florida, and from those stations to retailers and consumers. The Atlantic Coast Line, which carried gas from the Port Tampa and Jacksonville facilities to the bulk stations, sought to charge intrastate rates for those shipments. Standard Oil of Kentucky sued in district court to force the railroad to accept interstate rates.

The Supreme Court held that the contested shipments from the hub to the bulk stations were intrastate in character. The Louisiana company, which shipped the gas to Florida, delivered the gas when it reached the ports. The Louisiana company had no intent to ship the gasoline beyond the Port Tampa and Jacksonville facilities; the subsequent shipments were the business of the Kentucky company. Moreover, the gasoline did not travel pursuant to any transit provision. Because there was no transit privilege, and because the shipper sold the gas when it reached the hub, the Supreme Court's holding is consistent with the two-factor test outlined above.

Nor is *Chicago, Milwaukee & St. Paul Ry. v. Iowa*, 233 U.S. 334, 34 S.Ct. 592, 58 L.Ed. 988 (1914), relied on by the *Atlantic Coast* Court, inconsistent with the ICC's rule. That case arose out of a hub-and-spoke system operated by Clark Coal and Coke Company. The Clark Company shipped coal from Illinois to Davenport, Iowa, via the Rock Island and Burlington railways. In Davenport, the Clark Company transferred some Rock Island and Burlington cars to an interchange track, and asked the Chicago, Milwaukee & St. Paul railway to haul the cars to consumers elsewhere in Iowa. The Milwaukee & St. Paul company refused, insisting that the coal first be unloaded into Milwaukee & St. Paul rail cars. The Clark Company sought and obtained an order from the Iowa State Railroad Commission compelling the Milwaukee & St. Paul Company to accept the Rock Island and Burlington cars. The state of Iowa then sued in state court to enforce the Commission's order. The defendant railroad appealed, eventually to the United States Supreme Court, arguing, among other things, that the State Commission lacked jurisdiction because the coal was in interstate, not intrastate, commerce. The railroad claimed that the use of the Davenport hub, and the change of carriers at that point, was simply a device designed to obtain the benefit of *intrastate* rates, which in this instance were lower than the interstate alternative, for the final portion of the journey.

The Court upheld the decisions of the Iowa courts and agency. The Court drew attention to the findings of the Iowa adjudications, which concluded in part that the

> certainty in regard to the shipments of coal ended at Davenport. The point where the same was to be shipped beyond Davenport, *if at all*, was determined after the arrival of the coal at Davenport. The coal was under the control of the consignee and he could sell it in transit *or at Davenport* or reconsign it to a point on respondent's railway, or any other railway, at his own discretion.... The [Iowa] court said that the facts showed the coal was originally consigned to the coal company in Davenport, that it was there held until sales were made, that the consignee had taken delivery, paying the freight to the initial carrier and assuming full control.

233 U.S. at 342–43, 34 S.Ct. at 594 (emphasis added). The *Chicago, Milwaukee* Court is less clear than the *Atlantic Coast* Court about whether the source-to-hub and hub-to-spoke movements involved a different shipper. *Compare* 233 U.S. at 340, 34 S.Ct. at 593 ("The Clark Coal & Coke Company ... *have been making shipments* from ... Illinois to Davenport....") with 233 U.S. at 343, 34 S.Ct. at 594 ("the coal was *originally consigned* to the coal company at Davenport"). However, the factual determinations accepted by the *Chicago, Milwaukee* Court make clear that the coal might have been, and perhaps sometimes was, sold at Davenport, the hub point.

Any further shipment was contingent upon the absence of a willing buyer at Davenport. Coal destined for further transport was commingled at the hub with coal destined or available for sale at Davenport. The Supreme Court's decision holding that the coal moved in intrastate commerce when it left Davenport is thus again consistent with the ICC's interpretation of the Motor Carrier Act.

The ICC's rule is likewise consistent with *Southern Pacific Transportation Co. v. ICC,* 565 F.2d 615 (9th Cir.1977). In that case, Del Monte shipped canned goods from California processing plants to a hub warehouse in Stockton, California. After arriving in Stockton, some goods were shipped to California destinations, while others were shipped across state lines. All of the goods travelled to the hub from the processing plants pursuant to transit privileges which enabled Del Monte to ship the goods according to the lower through rate if the goods were shipped across state boundaries. The ICC prohibited some small carriers, employed by Del Monte to transport goods on the plant-to-hub journey, from continuing to provide those services. The carriers lacked interstate operating authority, and the ICC determined that because the goods moved under the transit privilege, the goods were in interstate commerce even though the plant-to-Stockton trip took place entirely within California.

The Ninth Circuit set aside the ICC's order, stressing that no "fixed and persisting intent" to put the goods into interstate commerce existed before the goods arrived at the hub warehouse, since interstate and intrastate goods were commingled at the hub. "Inasmuch as it cannot be determined whether goods are committed to interstate or foreign commerce until they are shipped from the warehouse, the Commission's decision would lead to retroactive imposition of its jurisdiction, turning on whether particular goods are committed to interstate or foreign commerce upon subsequent shipment." 565 F.2d at 620. This rule accords with the ICC interpretation sketched above: when interstate and intrastate commerce are commingled at the hub

warehouse, there can be no fixed and persisting intent to ship beyond the hub. Indeed, the second of the two constituent factors we have identified derives from the ICC's discussion of *Southern Pacific. See* 2 I.C.C.2d at 72.

The ICC's reading of these cases is of course not the only possible one. The *Atlantic Coast* opinion, for example, includes the broad statement that the

> important controlling fact in the present controversy, and what characterizes the nature of the commerce involved, is that the plaintiff's whole plan is to arrange deliveries of all its oil purchases on the seaboard of Florida so that they may all be there stored for convenient distribution in the state to the [bulk stations and consumers].

275 U.S. at 269, 48 S.Ct. at 110–11. The *Southern Pacific* opinion suggests that the shipper's control of the hub warehouse may in and of itself negate the possibility of a "fixed and persisting intent" to ship the goods beyond the warehouse. 565 F.2d at 618. By focusing on these passages, together with the holding in *Chicago, Milwaukee,* it would be possible to construct an interpretation according to which a transit privilege could not suffice to demonstrate a "fixed and persisting intent" to ship goods in interstate commerce beyond a hub warehouse if the hub was under the shipper's control. This alternative interpretation of the case law would require us to reverse the ICC's order.

Under the *Chevron USA* standard, however, we are not free to reject the ICC's interpretation of the law merely because we prefer another, similarly reasonable interpretation. We must defer to the ICC if its interpretation is reasonable. The cases applying the "fixed and persisting intent" standard to hub-and-spoke distribution systems are complex and fact-specific. More than six decades of litigation has failed to produce a clean principle to govern these controversies. Under such circumstances, it is unsurprising that there is no single, dispositive reading of the law. As we have seen, the ICC's interpretation of the law is in fact consistent with the cases relied on

by Texas and the intervenors who object to the ICC ruling. It also draws support from past agency decisions which take a similar view of storage-in-transit provisions. In *Railroad Commission of Texas v. Oil Field Haulers Association, Inc.*, 325 I.C.C. 697 (1965), the Oil Field Haulers carried pipe into Texas and to storage yards maintained by the Haulers within Texas. The pipe was held at the yards pursuant to a storage-in-transit provision. Within two years, the Haulers would deliver the pipe to a customer somewhere in Texas. Texas sought to regulate the yard-to-customer trips, claiming that the trips were intrastate in character because entirely within Texas. Texas contended that "the shipper's intent is to stockpile the pipe at the transit point for future sale to a consumer, whose identity is unknown at the time the pipe leaves the originating point. The whole purpose of these distribution points is to provide a concentration of goods at a central place within a local area from which goods are to be shipped as the need arises." 325 I.C.C. at 700–01. The ICC held that the contested transport was interstate in character. The ICC reasoned that Texas had overlooked "the critical fact that this pipe is transported by defendants pursuant to the terms of the storage-in-transit provision." *See also Baltimore & O.S.W. R. Co. v. Settle*, 260 U.S. 166, 171, 43 S.Ct. 28, 30, 67 L.Ed. 189 (1922) (recognizing relevance of transit privileges to determinations of intent).

### C. Specific Interpretation

Our inquiry cannot, however, end here. We must determine not only whether the ICC has advanced a general theory that is reasonable, but also whether the specific interpretation relied upon in this case is likewise reasonable. I must now part company with the panel majority's holding, for the ICC's specific interpretation does not follow from—indeed, it contradicts—the ICC's more general interpretive principles.

According to the fact pattern considered by the ICC, all of the carpet shipped to the Arlington hub, and later transported to Texas destinations by Reeves, moved pursuant to a transit privilege. 2 I.C.C.2d at 66, 73, 74; Docket No. MC–C–10963 at 4. Yet while a transit privilege was used, it is much less clear that the Arlington-to-customer trips are interstate in character under the second factor recognized by the ICC's test, which requires that the shipper not commingle interstate and intrastate commerce at the hub warehouse. As the ICC itself recognized, more than six-sevenths of the carpet leaves the hub on intrastate carriers charging intrastate rates. The ICC concluded that the carpet carried by Reeves nonetheless moved in interstate commerce:

> we indicated that Reeves … is able to handle only 14 percent of the traffic moving out of Arlington. Intrastate carriers move the other 86 percent. Central argues that, because Armstrong's intent apparently disappears on 86 percent of the traffic once it leaves Arlington, our reasoning contains a fatal inconsistency. We disagree. The fact that some shipments do not continue movement from Arlington under the transit tariff has no bearing on the shipper's intent concerning those shipments that do continue, and it is these continuing shipments and their movement that are in issue here. At the time the carpet leaves Dalton, Armstrong clearly intends all of it to continue movement in interstate commerce from Arlington. This intent is thwarted on some traffic at Arlington due only to Reeves' lack of sufficient equipment and to Armstrong's inability to find other interstate carriers willing to participate. In any event, it is clear that Armstrong forms its intent at Dalton, the point of initial departure, and that this intent, through circumstances beyond Armstrong's control, is thwarted only later on some traffic at Arlington.

No. MC–C–10963 at 4–5.

Armstrong's "fixed and persisting" intent to ship its carpet in interstate commerce beyond the Arlington warehouse thus dissolves for some—indeed, the vast majority—of the carpet sent to the warehouse. This carpet, which Armstrong at

some point intends to—and does—transport in intrastate commerce, is commingled with the carpet which allegedly continues in interstate commerce. I fail to see how Armstrong can maintain a "fixed and persisting" intent to ship its carpet in interstate commerce beyond the Arlington warehouse when Armstrong so clearly changes its mind about so much of what it ships.

Nor do I comprehend the ICC's apparent distinction between an intent that expires and an intent that persists but is "thwarted." The ICC cites no cases to justify this distinction. It makes no sense in light of existing case law. It contradicts the ICC's general theory of the law. Would Armstrong's intent also be "thwarted" if an unexpected buyer—for example, a supplier, who operates his own fleet of trucks and so needs no transportation services, left without adequate stock after a labor strike at another carpet company—offered to purchase carpet at the warehouse at a price higher than other Armstrong customers would pay? The absence of a competitive buyer interested in Armstrong's "delivered rate" program would be a "circumstance beyond Armstrong's control." The ICC's test effectively eliminates the requirement that a shipper's intent be "fixed and persisting." The test likewise destroys the requirement of the *Southern Pacific* case, which limits the effect of a transit privilege upon the character of transportation in a hub-and-spoke system when the goods covered by the privilege move in both interstate and intrastate commerce after leaving the warehouse.

The dissolution or thwarting of Armstrong's intent at the warehouse distinguishes this case from the Eighth Circuit's recent *Middlewest Motor Freight* decision, 867 F.2d 458 (8th Cir.1989). The Eighth Circuit does not mention any local sales at the warehouse, any shipments via intrastate carrier, or any concept of "thwarted intent." The ICC's reasonable general interpretation suffices to decide *Middlewest Motor Freight.*

The ICC gives two deeper explanations for why some of Armstrong's carpet leaves Arlington on intrastate carriers. First, the ICC notes that traffic in the Dallas–Fort Worth commercial zone is handled by local carriers because, although that traffic moves in interstate commerce, transit within the zone is exempt from the ICC's economic regulation under 49 U.S.C. 10526(b). 2 I.C.C.2d at 67 & n. 5. Were this jurisdictional point the only reason for Armstrong's recourse to intrastate carriers, I might well agree with the majority's treatment of the ICC's declaratory order. It would be reasonable to construe all the carpet leaving Arlington to be in interstate commerce, while recognizing that some of the carpet was not subject to the ICC's control. Some of the carpet remaining in the Dallas–Ft. Worth area is, however, sold at the warehouse itself: the carpet's departure occurs by "customer pick-up." Moreover, the jurisdictional reason is not the primary one for Armstrong's use of intrastate carriers; indeed, Reeves' apparently carries only 14 percent of the traffic leaving Arlington for points in Texas *outside the Dallas–Ft. Worth commercial zone.* 2 I.C.C.2d at 67. Armstrong attributes the absence of interstate carriers willing to take these shipments to "the regulatory policy of the [Texas] Railroad Commission. Armstrong claims that, for years, the Railroad Commission has vigorously monitored transportation activities within Texas, and through innumerable enforcement proceedings, levying of fines, and a constant program of investigating carriers' records, the Railroad Commission has created an intimidating climate in the Texas transportation industry.... [Armstrong] claims that the Railroad Commission's regulatory policies deter interstate carriers from implementing innovative transportation services that might compete with Texas intrastate carriers." 2 I.C.C.2d at 67.

The Texas Railroad Commission's regulatory policies do not authorize either Armstrong or the ICC to transform what would otherwise be intrastate commerce into interstate commerce. If Texas is wrongfully regulating transportation, by exceeding its jurisdiction or by violating constitutional rights, the subjects of that regulation have a remedy before the ICC or in the federal courts. No such wrongful regulation has

even been alleged in this case. On the other hand, if Texas is simply regulating intrastate commerce in a manner not approved by the ICC, the ICC lacks the power to expand its jurisdiction to interfere with Texas' regulation. Any contrary interpretation of the Motor Carrier Act would contravene the clear intent of Congress. Congress did not give the ICC a regulatory power as broad as Congress' own power under the commerce clause. Instead, Congress explicitly preserved the power of states to regulate goods in intrastate commerce. *See* 49 U.S.C. § 10521(b)(1). *See also Louisiana Public Service Commission v. Federal Communications Commission,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (federal agency may not expand its own jurisdiction to defeat state regulation it believes damaging when Congress has deliberately preserved a role for state regulation).

Nor do the state's regulatory efforts trap Armstrong within a "catch–22." True, Armstrong contends that Texan regulation deprives it of the opportunity to hire enough interstate carriers to cover its Arlington operation, and thus renders the operation intrastate and so subject to Texan regulation. But Armstrong is free to petition the ICC for a declaratory order relevant to a purely interstate delivery program which it plans to inaugurate. If Texas were to harass carriers after the ICC declared the proposed program to the interstate, that harassment would presumably be unlawful. But again, no unlawful harassment has been alleged here. Armstrong complains only that Texas exercises its power too vigorously. The statutory division of power enacted by Congress permits and even invites the states to govern vigorously.

For these reasons, any effort to distinguish "transient" intent from "persisting but thwarted" intent on the ground that Armstrong would have acted differently absent Texas Railroad Commission regulatory policies must fail. Such a distinction would ignore the clear intent of Congress. Once we reject this distinction, however, the hub-to-customer journeys appear intrastate under the rule of *Southern Pacific:*

although the carpet travels under a transit privilege, the shipper commingles interstate and intrastate freight at the hub warehouse.

The ICC and the panel majority offer an alternative interpretation of *Southern Pacific* which would distinguish that case from this one. The ICC contends that in *Southern Pacific* the contested transport was intrastate because some of the traffic in the hub-and-spoke system never crossed a state boundary and so never entered interstate commerce, while in this case all of the traffic arriving at Arlington arrives in interstate commerce. This distinction misunderstands the analogy between the two cases. The California system is in many respects a "mirror image" of Armstrong's Texas system. In *Southern Pacific* goods travel within California to the hub, and then onward, in some cases crossing state lines. In this case, goods travel across state lines, and then onward within Texas, in some cases by interstate carrier and in some cases by intrastate carrier. In both cases, the issue is the character of the transport between the hub and a point within the hub's state. In both cases, the shipper controls the hub warehouse. In both cases, the question is whether control exercised at the warehouse will negate a transit privilege's apparent testimony to a shipper's intent. It simply begs the question to point out that in this case all of the goods have crossed state lines: everyone agrees that the journey to the hub is interstate in character; the question is whether the later journey from the hub—which crosses no state lines—is likewise interstate.

The *Southern Pacific* Court held that when the shipper decides at the warehouse whether goods will continue on in interstate or intrastate commerce, the shipper cannot have had, at the time it sent the goods to the hub, a "fixed and persisting" intent to ship the goods from the warehouse in interstate commerce. The ruling accords with common sense. And again, to adopt the interpretation proposed by the ICC would effectively eliminate the "fixed and persisting intent" requirement entirely.

Armstrong could ship carpet to Arlington, sell as much as it liked on the spot, ship as much as it liked on intrastate carriers, and ship what remained on interstate carriers. Armstrong's "intent" would be a pure fiction, bearing no relation at all to the actions Armstrong takes when the carpet reaches the warehouse.

This analysis of the Ninth Circuit's *Southern Pacific* decision draws additional support from a related line of cases: *Texas & N.O.R.R. Co. v. Sabine Tram Co.*, 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913); *Long Beach Banana Distributors, Inc. v. Atchison, T. & S.F.Ry. Co.*, 407 F.2d 1173 (9th Cir.1969); and *Burlington Northern, Inc. v. Weyerhaeuser Co.*, 719 F.2d 304 (9th Cir.1983). These cases involve the relation between one transportation leg that is geographically intrastate, and a second, connecting leg moving the goods to or from a foreign country. The cases fall under 49 U.S.C. § 10501 and its statutory predecessors, of the Interstate Commerce Act, rather than the provisions at issue in this case. Nonetheless, these cases, like those discussed above, seek to determine when movement to or from a "hub" port, over a geographically intrastate route, is interstate in character. In all three cases, the shipper controlled the goods at the hub port. The holdings in the three cases rest in part upon whether the shipper had an opportunity to, or did, divert some goods into intrastate commerce at the hub. *Sabine Tram*, 227 U.S. at 128–29, 33 S.Ct. at 235 (distinguishing *Gulf, Colorado & S.F. Ry. Co. v. Texas*, 204 U.S. 403, 27 S.Ct. 360, 51 L.Ed. 540 (1907), on the ground that in *Gulf Colorado* the shipper could have transferred the goods to intrastate commerce at the storage point); *Burlington Northern*, 719 F.2d at 309–10 (distinguishing *Sabine Tram* and *Long Beach Banana* from *Southern Pacific* and *Burlington Northern* on the ground that in the latter cases the shipper sometimes diverted goods into intrastate commerce).

Because the ICC's evaluation of Armstrong's reliance upon interstate carriers has no basis in the ICC's otherwise reasonable interpretation of the statute, I would reverse the ICC's ruling in this case. The concept of "thwarted intent" invoked by the ICC to justify its conclusions is defensible, even if one accepts the ICC's general principles. When a shipper transports goods to a hub warehouse pursuant to a transit privilege, the subsequent hub-to-customer trip is likely to be interstate in character unless the shipper commingles interstate and intrastate goods at the warehouse. Because Armstrong has done so here, the contested transport is intrastate in character.

## D. Conclusion

The ICC may regulate commerce that is interstate in character. Texas may regulate commerce that is intrastate in character. The character of commerce depends upon the "fixed and persisting intent" of the shipper. The ICC reasonably interprets this rule to imply that when a shipper transports goods across state lines to a hub warehouse pursuant to a transit privilege, the later hub-to-customer transport will be interstate in character, even if it does not again cross state lines, so long as the shipper does not commingle interstate and intrastate goods at the warehouse. These reasonable principles do not help Armstrong's cause, however, for Armstrong decides at its Arlington hub whether the carpet will continue on in intrastate rather than interstate commerce. The ICC's more specific interpretation, holding that the traffic out of Arlington is nonetheless interstate, is indefensible.

If Texas subjects a carrier to regulatory proceedings on the basis of transport which the carrier believes to be interstate, the carrier may ask the ICC to determine the character of the contested transportation. On the other hand, the ICC may not simply expand its jurisdiction in order to undo the effects of state regulation when it disagrees with state policy. If the ICC attempts to do so, we should restrain it. I would do so now. I therefore respectfully dissent from Part IV of the majority opinion, and from the corresponding portions of Part V.