**CENTRAL FREIGHT LINES (Substituted in place of Steere Tank Lines, Inc.), Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

No. 89–4114.

United States Court of Appeals, Fifth Circuit.

May 1, 1990.

**414**

Mert Starnes, Phillip Robinson, Robinson, Felts, Starnes, Angenend & Mashburn, P.C., Austin, Tex., for petitioners.

Patrick McEligot, Rea, Cross & Auchincloss, Washington, D.C., William P. Jackson, Jr., Jackson & Jessup, Arlington, Va., Susan J. Pisner, Martin W. Bercovici, Terrence D. Jones, William H. Borghesani, Jr., Keller & Heckman, Washington, D.C., Anne Swenson, Robert Ozer, Asst. Atty. Gen., Energy Div., Transp., Austin, Tex., William W. Pugh, Alexandria, Va., for intervenors.

Michael Martin, Robert S. Burk, Gen. Counsel, I.C.C., Laura Heiser, Robert B. Nicholson, U.S. Dept. of Justice, Appellate Section, Antitrust Div., Washington, D.C., for respondents.

Before THORNBERRY, POLITZ, and JOLLY, Circuit Judges.

THORNBERRY, Circuit Judge:

Central Freight Lines, Inc. ("Central"), challenges, on jurisdictional and substantive grounds, a declaratory order of the Interstate Commerce Commission ("ICC") ruling that certain transportation of fertilizer within Texas is part of a continuous interstate movement and that the ICC has regulatory jurisdiction over that transpor-

tation. We deny the petition to review the ICC's order.

## I. FACTS AND PROCEDURAL HISTORY

Arcadian Corporation ("Arcadian"), a manufacturer of fertilizer, ships liquid fertilizer in bulk from Nebraska by rail and from Louisiana by barge and rail to storage terminals in Texas, from where it is delivered by truck to customers in Texas. In 1986, Victoria Terminal Enterprises, Inc. ("VTE"), a motor carrier, sought and obtained an interstate certificate from the ICC to transport Arcadian's liquid fertilizer by truck from storage terminals in seven Texas counties to other points in Texas. The ICC issued the certificate pursuant to its regulatory jurisdiction over interstate transportation by motor carriers. 49 U.S.C. § 10521(a)(1).

VTE feared that despite its interstate certificate the Railroad Commission of Texas would investigate and prosecute it for conducting operations within Texas without *intrastate* authority. The Railroad Commission announced in a letter to the Texas Motor Transportation Association dated May 12, 1986, that it did not consider itself bound by the ICC's declaratory order in another case, *Armstrong World Industries, Inc.—Transportation within Texas*, 2 I.C.C.2d 63 (1986), *aff'd sub nom Texas v. United States*, 866 F.2d 1546 (5th Cir.1989), in which the ICC held that certain transportation of carpet within Texas was interstate transportation subject to ICC regulation. The Railroad Commission indicated in its letter that it intended to make a high priority of investigating and prosecuting operations similar to those in *Armstrong*. Since VTE's operations were similar to the operations at issue in *Armstrong*, VTE petitioned the ICC on August 8, 1986, for a declaratory order regarding the interstate nature of the transportation it proposed to provide to Arcadian pursuant to its ICC certificate.

In November 1986, the ICC instituted a declaratory order proceeding and published a notice in the Federal Register inviting comments by persons interested in participating in the proceeding. Thirty-two interested parties submitted written comments. Among them were Central, the petitioner herein, and the state of Texas, an intervenor herein.

VTE and Arcadian provided a detailed description of Arcadian's traffic, which the ICC found sufficient for its determination even though VTE had not actually begun transporting fertilizer for Arcadian. According to this description, Arcadian ships fertilizer to customers in Texas via a hub and spoke system. Arcadian ships fertilizer from Nebraska and Louisiana to seven storage terminals (hubs) in Texas, from where it is delivered in smaller shipments to customers (spokes) in Texas. Each terminal in Texas serves 20 to 25 customers, consisting of dealers and some large farms.

Arcadian determines the amount and timing of fertilizer shipments to the storage terminals by means of pre-existing orders and non-binding annual dealer and customer estimates of quarterly needs. According to an Arcadian survey of the correlation between 34 dealer estimates and actual sales at one Texas terminal, dealers purchased an average of 137% of their estimates; in only six instances did dealers purchase less than 80% of their estimates. Arcadian found this correlation representative of its overall experience with dealer estimates.

Arcadian leases the storage terminal facilities on a year-round basis, and has exclusive use of certain storage tanks. The leases provide that fertilizer brought in from outside Texas is loaded into certain tanks and is not commingled with any other products.[1] Most transportation of fertilizer from the terminals to its ultimate des-

---

1. Any blending of Texas-produced ammonium thiosulfate into the out-of-state fertilizer known as "Uran," to produce "Suran," another of Arcadian's products, is done in a separate tank. The subsequent movement of the blended product is not performed by VTE and therefore is not at issue here. Moreover, Arcadian stated that it does not engage in "trading-out" practices, whereby producers exchange products to accomplish deliveries in areas where one producer may not have distribution or manufacturing facilities.

tinations is arranged by the ultimate purchasers, but Arcadian arranges about 20% to 40% of the deliveries under its prepaid "primary carrier" delivery system. It is for the provision of this latter category of transportation that Arcadian contracted with VTE.

Most of the fertilizer distributed through the Texas terminals originates in Geismar, Louisiana, and is delivered to the terminals in bulk movements by barges exempt from ICC regulation. A small amount is shipped by rail tank cars to the terminals, primarily from La Platte, Nebraska.[2]

Most of Arcadian's annual sales occur between January and May; almost 35% occur in an eight-week period between January and March. In June, Arcadian begins the process of resupplying terminals depleted during the heavy sales period. Arcadian's customers place their orders by telephone. Arcadian fills advance orders directly from the point of manufacture, and fills short notice orders either from the point of manufacture or from product on hand at the terminals. Arcadian's objective is to have at least enough fertilizer on hand at the terminals to cover any sales that might occur before it could resupply the terminal.

VTE's interstate tariff limits VTE's single-state service to commodities that have been placed in temporary storage in transit. The tariff requires that delivery to a terminal in Texas from a point outside Texas have occurred within 364 days before VTE picks up the commodity. The prior movement into Texas must have been by rail or water. If the rail or water movement precedes the motor movement by more than 24 hours, the shipper must also comply with the storage-in-transit provisions of the tariff in order for VTE to handle the subsequent movement. The bill of lading for a shipment of fungible commodities shipped in bulk must be presented to VTE at the time of pickup and must show certain facts. The bill of lading must bear the notation "To be stored in transit

at [name of Texas storage point]" and must describe the material transported, its origin, the date of shipment from outside Texas, the date of delivery into storage, the name of the carrier that transported the shipment from outside Texas to the Texas storage point, and the total quantity of the type of product VTE is to pick up that is on hand at the Texas storage facility. The bill of lading also must state that none of the product VTE is to transport has previously been stored in Texas or has undergone manufacture or refinement within Texas, and that the tank or silo from which the commodities will be loaded into VTE's truck is reserved for the exclusive use of the shipper.

Finding that these material facts were not in dispute, the ICC denied requests for oral hearing. *Victoria Terminal Enterprises, Inc.—Transportation of Fertilizer Within Texas*, No. MC–C–30002 (ICC Nov. 25, 1987) [*Victoria I*], slip op. at 1. The ICC found that it had jurisdiction to rule on VTE's petition for a declaratory order. *Id.* at 2. The ICC then found the transportation within Texas as described by VTE to be interstate in character, as part of a continuous interstate movement. *Id.* at 7–10.

The ICC also concluded that the exempt nature of the barge movements bringing fertilizer into Texas did not preclude its finding that the subsequent motor movements within Texas are in interstate commerce. *Id.* at 10–11. Because some of the fertilizer is brought into Texas by barge movements exempt from ICC regulation under 49 U.S.C. § 10542(a), the ICC found that the transportation within Texas subsequent to the barge movements, although in interstate commerce and thus not subject to state regulation, is also exempt from the ICC's regulatory authority. *Id.* at 11.

Steere Tank Lines, an interested party in the ICC proceeding, filed a petition for review in this court pursuant to 28 U.S.C. § 2342(5). Several interested parties also moved to reopen the ICC proceeding. The

---

**2.** Some fertilizer travels by barge to coastal points in Texas and then by rail from the coast to landlocked terminals.

ICC denied the motions to reopen. *Victoria Terminal Enterprises, Inc.—Transportation of Fertilizer Within Texas*, No. MC–C–30002 (ICC Apr. 19, 1988) [*Victoria II*]. Steere then filed a second petition for review in this court.

On January 18, 1989, we granted the ICC's motion for voluntary remand of Steere's petitions for review to permit the agency to reconsider one aspect of its prior decisions. On reconsideration, the ICC held that it had jurisdiction to regulate the transportation within Texas that was part of a continuous interstate movement, even though the preceding interstate barge transportation from Louisiana to Texas was exempt from regulation. *Victoria Terminal Enterprises, Inc.—Transportation of Fertilizer Within Texas*, No. MC–C–30002 (ICC Jan. 27, 1989) [*Victoria III*]. To reach this conclusion, the ICC found it necessary to overrule an earlier decision, *Behnken Truck Service, Inc., Extension—Exbarge Traffic*, 103 M.C.C. 787 (1967).

Central now petitions this court to review and set aside the ICC's order.

## II. JURISDICTION TO REVIEW THE ICC ORDER

### A. Case or Controversy

The state of Texas argues that the ICC did not have jurisdiction to issue the declaratory order and that this court does not have jurisdiction to review the ICC's order because the order does not present a case or controversy as required by Article III of the United States Constitution. Because VTE has not yet begun transporting Arcadian's fertilizer pursuant to its ICC certificate, Texas argues that both the ICC declaratory order and judicial review of the order amount to constitutionally proscribed advisory opinions. Texas also bases its position on the ICC's statement that the proceeding "makes no final determination as to any specific rights of any party." *Victoria II*, slip op. at 1 (footnote omitted).

■ Texas's first argument that the ICC did not have jurisdiction to issue the order fails in light of our opinion in *Texas v. United States*, 866 F.2d 1546 (5th Cir.

1989). The ICC has primary jurisdiction to determine the interstate nature of the transportation at issue. *Texas v. United States*, 866 F.2d at 1551–54; *see also Service Storage & Transfer Co. v. Virginia*, 359 U.S. 171, 79 S.Ct. 714, 3 L.Ed.2d 717 (1959) (ICC has primary jurisdiction to interpret the scope of ICC certificates); *Middlewest Motor Freight Bureau v. ICC*, 867 F.2d 458, 459–60 (8th Cir.), *cert. denied sub nom Missouri Div. of Transp. v. ICC*, —— U.S. ——, 110 S.Ct. 234, 107 L.Ed.2d 185 (1989). It is also well established that the case or controversy requirement of Article III "does not restrict an agency's authority to issue declaratory rulings under 5 U.S.C. § 554(e)." *Texas*, 866 F.2d at 1551. Under the Administrative Procedure Act, administrative agencies in their "sound discretion" may issue declaratory orders "to terminate a controversy or remove uncertainty." 5 U.S.C. § 554(e).

Texas next argues that even if the ICC was not precluded from issuing the order, this court is precluded from reviewing it because it does not present a case or controversy as required by Article III of the United States Constitution. Although we did not directly address the case or controversy issue in *Texas*, we think the reasoning we used in *Texas* to determine whether an ICC order was final and thus reviewable is equally applicable to the case or controversy issue. We held that "ICC orders are clearly reviewable when those orders affect the rights of the parties, or when the rulings touch 'vital interests of carriers and shippers.' " *Texas*, 866 F.2d at 1551 (quoting *Frozen Food Express, Inc. v. United States*, 351 U.S. 40, 44, 76 S.Ct. 569, 571, 100 L.Ed. 910 (1956)).

■ Like the ICC order in *Texas*, the order in this case settles rights and removes uncertainty in that it allows VTE to rely on its interstate certificate as authorization for its actions so long as its operations conform to the facts it presented to the ICC and which the ICC assumed in the declaratory order. *See Texas*, 866 F.2d at 1551. The ICC acknowledged that the proceeding makes no final determination as to the parties' specific rights, because inter-

ested parties may "attempt to demonstrate different facts and argue for a different legal conclusion based on those facts." *Victoria II*, slip op. at 1–2. The ICC considered the transportation at issue in *Texas* only in terms of the facts presented by the shipper and carrier requesting the order. Like the order in *Texas*, the ICC's order in this case would not insulate the carrier from a state law regulatory proceeding if facts were proved that were different from those supposed by the order. *See Texas*, 866 F.2d at 1551.

Texas attempts to distinguish the *Texas* case by pointing out that in that case the transportation operation had already begun and was already the subject of a state court enforcement action. It is true that in this case VTE has not yet begun its operations and no state action is pending. There was in this case, however, a definite threat of state action evidenced by the Texas Railroad Commission's letter.

Texas relies on *Public Serv. Comm'n v. Wycoff*, 344 U.S. 237, 73 S.Ct. 236, 97 L.Ed. 291 (1952), in which the Supreme Court dismissed, for want of a case or controversy, an action for a declaratory judgment that an ICC license authorized single-state transportation as part of a continuous interstate movement. In *Wycoff* the state had allegedly threatened to prosecute the trucker for failure to obtain an intrastate license, but there was no evidence of such a threat. We effectively disposed of Texas's reliance on *Wycoff* in *Texas*, in which we distinguished *Wycoff* on the ground that *Wycoff* involved a declaratory proceeding before a federal district court under 28 U.S.C. § 2201 rather than a declaratory proceeding before the ICC. We also found that *Wycoff* did not "sustain a general rule holding that ICC declaratory judgments construing the scope of an interstate certificate are advisory, not final, or in any other respect not reviewable." *Texas*, 866 F.2d at 1551.

Moreover, we think the declaratory order touches vital interests of the intrastate carriers that participated in the proceeding, including Central, the petitioner herein, because the order enables VTE, by relying on its interstate certificate, to undercut the higher intrastate rates charged by those carriers. Hence, because the ICC's order both settles rights and touches vital interests of carriers, this court has jurisdiction to review the order.

### B. Arbitrary and Capricious Initiation of Proceeding

The state of Texas argues in the alternative that the ICC acted arbitrarily and capriciously in initiating a declaratory order proceeding in view of other decisions in which the ICC declined to initiate such proceedings. Hence, Texas asserts, the declaratory order must be held unlawful and set aside as arbitrary and capricious under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A). Specifically, Texas cites *Arvada Transfer Co.*, No. MC–C–30074 (ICC Mar. 8, 1988), and *L.E. Matchett Trucking Co.*, No. MC–C–30101 (ICC June 23, 1988), in which the ICC declined to initiate declaratory order proceedings. The state of Texas asserts that the VTE declaratory proceeding contained the same elements as *Arvada* and *Matchett*—a transportation operation that had not yet begun, and pure speculation that adverse state action would occur—yet in this case the ICC arbitrarily decided to initiate a proceeding.

In *Arvada*, the ICC found that the motor carrier's petition for a declaratory order was not ripe for review because it was based only on the motor carrier's speculation that the Colorado Public Utility Commission would take adverse action on the motor carrier's pending application for intrastate authority. The speculation grew out of formal protests by other carriers that the petitioning motor carrier was unfit for an intrastate license because it had already been operating unlawfully in Colorado without intrastate authority. The ICC ruled that such speculation about possible adverse state action was not sufficient to constitute uncertainty or a controversy for purposes of a declaratory order. *Arvada*, slip op. at 1.

In *Matchett*, the ICC declined to initiate a declaratory proceeding because the peti-

tioning motor carrier had not yet begun operations and because the states involved had not indicated that they considered the proposed operations to be intrastate in nature. *Matchett*, slip op. at 1.

■ By contrast, a threat of state prosecution existed in this case. The letter of May 12, 1986, from the Railroad Commission of Texas indicates that the state of Texas disputed interstate carriers' claims that transportation operations similar to those at issue in *Armstrong World Industries, Inc.—Transportation within Texas*, 2 I.C.C.2d 63 (1986), constituted interstate commerce, and indicates that Texas would vigorously prosecute such operations. In *Texas*, affirming the ICC's *Armstrong* decision, this court stated,

> Because the ICC will have primary jurisdiction to adjudicate the scope of an ICC certificate, nobody is disadvantaged by permitting a carrier (or shipper) to obtain the judgment of the ICC as soon as it became clear that a state regulator disputes the carrier's own interpretation of its license.

*Texas*, 866 F.2d at 1554. Even though the May 12 letter does not specifically refer to VTE or Arcadian, it is clear from the letter that the relevant Texas regulatory body disputed VTE's interpretation of its ICC certificate.

Moreover, in both *Arvada* and *Matchett*, the ICC specifically referred to its decision in *Matlack, Inc.—Transportation Within Missouri*, No. MC–C–10999 (ICC June 1 & Dec. 16, 1987), *aff'd sub nom Middlewest Motor Freight Bureau v. ICC*, 867 F.2d 458 (8th Cir.), *cert. denied sub nom Missouri Div. of Transp. v. ICC*, —— U.S. ——, 110 S.Ct. 234, 107 L.Ed.2d 185 (1989), as providing guidance for the resolution of controversies regarding the appropriate characterization of movements as interstate or intrastate. The ICC wants carriers to look to *Matlack* as an example of the kind of controversy in which the ICC intends to initiate declaratory order proceedings. In *Matlack*, the carrier had received citations from the state claiming that the carrier's single-state movements were performed without the required intrastate li-

cense. The facts in this case may not have presented as clear a threat as those in the subsequent *Matlack* decision. But the ICC decided the *Matlack* case and established it as a guiding case after it had already initiated a declaratory order proceeding in this case on October 28, 1986. Hence the *Matlack* criteria were not relevant to this case.

The Administrative Procedure Act leaves it to the sound discretion of the administrative agency to decide whether to institute a declaratory order proceeding. 5 U.S.C. § 554(e); *see, e.g., Intercity Transp. Co. v. United States*, 737 F.2d 103, 109–10 (D.C. Cir.1984). We do not think the ICC was arbitrary or capricious or abused its discretion in opening this proceeding.

## III. SUBSTANTIVE REVIEW OF THE ICC ORDER

This court may set aside an agency's adjudicatory ruling, such as a declaratory order, only if the agency's findings or conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Texas v. United States*, 866 F.2d 1546, 1555–56 (5th Cir.1989). We thus limit our inquiry in this case to a consideration of whether the ICC's conclusions are rationally supported. *See Texas*, 866 F.2d at 1556.

## A. Single–State Movements in Interstate Commerce

■ The characterization of transportation between two points within a single state as interstate or intrastate depends on the essential character of the shipment involved. *Texas*, 866 F.2d at 1556; *Texas & N.O.R. Co. v. Sabine Tram Co.*, 227 U.S. 111, 126, 33 S.Ct. 229, 234, 57 L.Ed. 442 (1913). The crucial factor in determining the essential character of a shipment is "the shipper's fixed and persisting intent at the time of shipment." *Texas*, 866 F.2d at 1556 (quoting *Armstrong World Industries, Inc.—Transportation within Texas*, 2 I.C.C.2d 63, 69 (1986)); *see also Baltimore & O.S.W.R. Co. v. Settle*, 260 U.S. 166, 170–71, 43 S.Ct. 28, 30, 67 L.Ed. 189 (1922). Whether the shipper has the requi-

site intent to move goods in interstate commerce depends on the totality of the facts and circumstances of each case. *Texas,* 866 F.2d at 1560; *see, e.g., Settle,* 260 U.S. at 170–71, 43 S.Ct. at 30.

■ The ICC determined that Arcadian intended its shipments through the Texas storage terminals to be continuous interstate movements. The ICC found the following facts and circumstances particularly significant as indications of Arcadian's intent:

> [1]  The shipments are made pursuant to specific orders or customer estimates of need which accurately predict how much product eventually will be delivered to each customer.  [2] Most of Arcadian's fertilizer moves through the terminals rapidly, especially during the spring planting season.  [3] Moreover, Arcadian's shipments are made pursuant to a storage-in-transit provision in an appropriate tariff.

*Victoria I,* slip op. at 7.

The ICC first noted that Arcadian's fertilizer leaves the point of manufacture with a narrowly defined ultimate destination, based on advance estimates and orders. Each storage terminal serves only 20 to 25 customers, and all the fertilizer stored at a terminal is eventually shipped to one of those 20 to 25 customers. Customer estimates of need and specific customer orders provide Arcadian with advance information about the destination of most of the fertilizer it ships. *Id.* at 7–8.

Second, the ICC found it significant that Arcadian does not stockpile its fertilizer for long periods of time, but that the fertilizer normally remains at the Texas terminals only a short time. During the peak season, the throughput time for the fertilizer shipped through the terminals is less than 30 days. *Id.* at 8. *See United States Dept. of Defense v. Interstate Storage & Pipeline Corp.,* 353 I.C.C. 397, 408, 409 (1977) (storage for an average of 66 days was merely a "temporary pause" in interstate commerce).

Third, the ICC emphasized that use of a storage-in-transit provision is indicative of the through character of the movement.

The ICC found the storage-in-transit provisions of VTE's tariff to be largely the same as those in *Armstrong,* 2 I.C.C.2d 63 (1986), which the ICC found to be a strong indication of the interstate character of the movements involved in *Armstrong. Victoria I,* slip op. at 9. Traffic moving pursuant to the storage-in-transit provision of VTE's tariff bears the notation "To be stored in transit at [name of Texas storage point]." The conditions governing the subsequent motor movement by VTE are also similar to those in *Armstrong:* both require the shipper to provide the carrier with information on the origin of the commodities, the date of shipment, the date of arrival in Texas, and the name of the carrier moving the commodities to Texas. Both limit the transit privilege to shipments forwarded within one year of their arrival at the storage terminals.

The ICC acknowledged some difference between the shipment of fertilizer, a fungible commodity, and the carpet at issue in *Armstrong* for which particular shipments could be identified. But the ICC found that VTE's tariff sufficiently connects each single-state movement with recent interstate movements to the storage terminals. VTE's tariff requires Arcadian to establish that none of the product VTE is to transport has previously been stored in Texas or has undergone manufacture or refinement within Texas, that the tank or silo from which the commodities will be loaded into VTE's truck is reserved for the exclusive use of the shipper, and that the total quantity of the type of product VTE is to pick up which is on hand at the Texas storage facility was delivered to that facility within 364 days before VTE picks up the commodity. *Id.* at 9–10.

Central's fundamental disagreement with the ICC order is its contention that the ICC's opinion is inconsistent with controlling precedent. Central raises several cases it claims require a different result because the ICC's order in this case is inconsistent with them. We note first that our task on review is to decide not whether we would construe the precedents as the ICC did, but whether the ICC's construc-

tion is reasonable and whether it has explained any departures from its past actions. *Texas*, 866 F.2d at 1556–57.

Central first challenges the ICC's analysis because the ICC did not employ its previously established "three-part test" to determine the essential nature of the commerce. *See Determination of Jurisdiction over Transportation of Petroleum and Petroleum Products by Motor Carriers Within a Single State*, 71 M.C.C. 17, 29 (1957). Under that test, the major factors that could preclude single-state transportation from being considered interstate in nature are (1) that there is no specific order destined for a specific destination; (2) that the terminal storage is a distribution point or local marketing facility; and (3) that transportation from hub to spoke is arranged only after sale or allocation from storage. *Id.* The ICC neither distinguished nor applied the *Petroleum Products* test in this case. Rather, it appears to have implicitly recharacterized the applicable test in *Armstrong* and again in *Matlack*. We think the standard adopted in *Armstrong* and *Matlack*, and applied in this case, is not unreasonable or inconsistent with the rationale of other cases.[3] For example, the emphasis on transit privileges finds support in *Baltimore & O.S.W.R. Co. v. Settle*, 260 U.S. 166, 171, 43 S.Ct. 28, 30, 67 L.Ed. 189 (1922).

Central relies on *Atlantic Coast Line R. Co. v. Standard Oil of Kentucky*, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927) for the proposition that a shipper must know the final destination of goods before it can intend that they move continuously in interstate commerce. However, the ICC plausibly distinguished *Atlantic Coast Line* on several grounds. As the ICC explained, the storage in *Atlantic Coast Line* was not pursuant to a transit arrangement, unlike Arcadian's storage. *Victoria I*, slip op. at 8. Additionally, the ICC distinguished *Atlantic Coast Line* because that case involved two separate shippers, one to the terminals and one from the terminals, so that the out-of-state shipper was not the

person who determined the final destination. *Victoria II*, slip op. at 3; *see also Texas*, 866 F.2d at 1557. Here, in contrast, Arcadian determines the final destination pursuant to customer orders. Furthermore, delivery to the terminals is part of a distribution plan based upon specific need estimates for identified customers, rather than a means of stockpiling and maintaining inventory at the terminals. *Victoria II*, slip op. at 3. Finally, the ICC has held in other instances that the shipper need not know the exact identity of particular consumers in order to intend that the goods move continuously in interstate commerce. *E.g., Railroad Comm'n of Texas v. Oil Field Haulers Ass'n*, 325 I.C.C. 697, 701 (1965).

Central also maintains that *Southern Pacific Transp. Co. v. ICC*, 565 F.2d 615 (9th Cir.1977) and *Burlington Northern v. Weyerhaeuser Co.*, 719 F.2d 304 (9th Cir. 1983), are mirror images of this case and mandate a different result. Both of those cases involved shipments from a point in one state to a storage facility in the same state, from where some, but not all, of the commodities shipped moved to out-of-state destinations. The Ninth Circuit held in each case that the initial movement to the storage facilities was intrastate, since the shipper had not manifested intent at the time of the initial shipment that all or a particular segment of the goods would move out-of-state. We found in *Texas* that the ICC reasonably distinguished *Southern Pacific*: In *Southern Pacific*, goods bound for local markets were commingled with goods bound for interstate markets, "with the potential for deviously using interstate storage-in-transit privileges on the initial part of the trip." *Texas*, 866 F.2d at 1559. But in *Armstrong*, as in this case, all goods came from outside Texas, so there was "no opportunity to commingle local and interstate freight." *Id.* The distinction is as reasonable in this case as it was in *Texas*. The Ninth Circuit made the same distinc-

---

**3.** The ICC also applied the *Armstrong* standard in *Quaker Oats Co.—Transportation Within Texas and California*, No. MC–C–30006, slip op. at 8–13 (ICC Aug. 10, 1987), *review denied sub nom California Trucking Ass'n v. ICC*, 893 F.2d 1338 (9th Cir.1989).

tion in *Burlington Northern*, 719 F.2d at 310; *see Texas*, 866 F.2d at 1560.

Central asserts that an ICC case, *Surles Contract Carrier Application*, 4 M.C.C. 488 (1938), also compels a finding that the transportation at issue is intrastate. In *Surles*, the ICC found transportation from a warehouse in Texas to other points in Texas to be intrastate in character, notwithstanding the fact that the goods had come from an out-of-state source. The ICC found that mere intent to distribute the merchandise at some future time did not establish the essential continuity of movement required to make the second leg of the transportation interstate in nature. *Surles*, 4 M.C.C. at 494. However, the ICC has since found it significant that in *Surles*, unlike the case at bar, there was no storage-in-transit provision to evidence a more specific intent. *Armstrong*, 2 I.C. C.2d at 70.

As in *Armstrong*, in this case the ICC found the storage-in-transit provision in the carrier's tariff to be particularly significant as evidence of the shipper's intent. Central alleges that the storage-in-transit provision is a sham whose sole purpose is to avoid legitimate state regulation. According to Central, the purpose of a bona fide storage-in-transit tariff is to enable a shipper to obtain a through rate for the entire trip that is lower than the sum of the local rates for the first and second legs of the trip. *See Southern Pacific*, 565 F.2d at 616. But VTE does not maintain a common arrangement with the carrier for the first leg of the trip, and the rate it charges has no relation to the rate charged by the initial carrier. Thus, Central asserts, there is no practical reason for the storage-in-transit conditions in VTE's tariff.

The ICC responds to this argument in two ways. First, it notes that under its regulations, a "through rate" may be "a combination of separately established rates." *See* 49 C.F.R. 1312.1(b)(37) (1989). Second, and more persuasively, the ICC argues that the significance of the storage-in-transit provision is that it is evidence of the shipper's intent, and a reduced rate is irrelevant to the shipper's intent.

According to the ICC, a storage-in-transit tariff can be a determinative indication of the through character of the movement. *See Texas*, 866 F.2d at 1560–61; *Settle*, 260 U.S. at 171, 43 S.Ct. at 30. A storage-in-transit tariff may effectively convert what would otherwise be a separate movement into part of a through interstate movement by tying movements together into a continuing service. *See, e.g., Railroad Comm'n of Texas v. Oil Field Haulers Ass'n*, 325 I.C.C. 697, 701, 702 (1965) (storage-in-transit arrangement was critical in finding that shipments of pipe from outside Texas into storage in Texas and subsequent shipments to customers within Texas constituted one continuous interstate movement); *Commercial Oil Transport Extension—Jacksonville, Ill.*, 73 M.C.C. 527, 532 (1957) (existence of transit arrangements was sufficient to convert movements into Illinois and subsequent movements to other points within Illinois into a through interstate movement).

If the only requirement were a stamp at the point of initial shipment, the shipper would have an incentive to stamp the shipment as storage-in-transit regardless of intent as to the final destination of the goods, because the shipper receives a reduced rate by virtue of the characterization of the second leg of the trip as interstate. But VTE's storage-in-transit tariff contains other requirements as described above, which ensure that the shipments VTE makes are part of a continuous movement of the fertilizer from outside Texas. These requirements ensure that the fertilizer picked up by VTE was shipped by barge or rail from outside Texas, was stored in Texas for less than a year, and underwent no processing or commingling with Texas-produced products. Since this information need be provided only when VTE picks up the fertilizer from the storage terminals, it is evidence enough that only those shipments that VTE picks up (and not the transportation arranged by customers themselves) are characterized as interstate by virtue of the storage-in-transit tariff.

We think the ICC has applied the "fixed and persistent intent" rule reasonably in

deciding that under the totality of facts and circumstances of this case, Arcadian has the requisite intent to move its fertilizer in interstate commerce. Therefore, we find the ICC did not err in finding that when Arcadian transports goods across state lines to a storage terminal pursuant to a storage-in-transit privilege, the subsequent transportation from the terminal to customers is still interstate in character, even though it is within one state. The ICC followed its prior cases in reaching this determination, and it did not unreasonably construe federal precedents. It reasonably distinguished cases that might suggest a different result. Hence we find that the ICC was not arbitrary or capricious in its determination that VTE's single-state movements are part of a continuous movement in interstate commerce.

## B. Regulation of Ex–Barge Movements

In *Victoria I* and *Victoria II*, the ICC found that VTE's single-state motor carrier movements are in interstate commerce even though some of them follow prior bulk barge movements that are exempt from ICC regulation under the Interstate Commerce Act, 49 U.S.C. § 10542(a).[4] We cannot disagree with this part of the ICC's position. If the essential character of the transportation, as determined primarily by the shipper's intent, is interstate, we do not see how that interstate character changes when one leg of the journey is performed by a carrier that happens to be exempt from ICC regulation.

The ICC noted, however, that under its prior decision in *Behnken Truck Serv., Inc., Extension*, 103 M.C.C. 787 (1967), it lacked the authority to regulate the single-state motor carrier movements that followed the exempt barge movements. Hence the ICC's position at that point in this proceeding was that neither the ICC nor the state of Texas had regulatory jurisdiction over the "ex-barge movements" (single-state movements that follow exempt barge transportation).

In *Victoria III*, the ICC reconsidered its position and overruled *Behnken* to find that although it cannot regulate the barge transportation because of the exemption in 49 U.S.C. § 10542(a), it does have jurisdiction to regulate the subsequent ex-barge movements by motor carrier. *Victoria III*, slip op. at 2. The ICC overruled *Behnken* based on the statutory language in the original Interstate Commerce Act pertaining to motor transportation.

By Act of October 17, 1978, Pub.L. 95–473, 92 Stat. 1337, Congress recodified the Interstate Commerce Act. The recodification "may not be construed as making a substantive change in the laws replaced." Act of Oct. 17, 1978, § 3(a), Pub.L. 95–473, 92 Stat. 1466. Hence, whether the ICC has jurisdiction to regulate the ex-barge traffic turns upon the meaning of the original pre-recodification version of 49 U.S.C. § 10521(a).

In examining the pre-recodification version of the Interstate Commerce Act, we are mindful that we must honor the ICC's interpretation of its statute so long as that interpretation is a reasonable one. In the absence of clear Congressional intent, a court should

> not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

Congress granted the ICC jurisdiction over "the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce." 49 U.S.C. § 302(a) (current version at 49 U.S.C. § 10521(a)). Congress defined "interstate

---

**4.** Under 49 U.S.C. § 10542(a)(1), "[t]he Interstate Commerce Commission does not have jurisdiction ... over transportation by a water carrier of commodities in bulk that ... (A) are loaded and carried without wrappers or containers; and (B) are received and delivered by the carrier without transportation mark or count."

commerce" for the purposes of Part II of the Interstate Commerce Act pertaining to motor carriers as "commerce between any place in a State and any place in another State ... whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water." 49 U.S.C. § 303(a)(10) (current version at 49 U.S.C. § 10521(a)). Each state retained the exclusive exercise "of the power of regulation of intrastate commerce by motor carriers." 49 U.S.C. § 302(b) (current version at 49 U.S.C. § 10521(b)).

The above statutory language pertaining to interstate motor transportation fits the facts of this case; Arcadian's shipments move by common carrier partly by water, partly by rail, and partly by motor vehicle, between a place in Louisiana and a place in Texas. The ICC construed the statute to mean that since the whole barge-truck journey is a movement between states, *i.e.*, a movement in interstate commerce, the ICC may regulate the part of that journey undertaken by motor carrier, even though that particular part is within a single state. In other words, based on the statutory definition of interstate commerce, VTE's single-state movements would constitute transportation by a motor carrier engaged in interstate commerce, and therefore, would be subject to ICC regulation. We think this is a permissible construction of the statute.

Central challenges this conclusion as being in conflict with *Pennsylvania R.R. Co. v. Public Util. Comm'n of Ohio*, 298 U.S. 170, 56 S.Ct. 687, 80 L.Ed. 1130 (1936), in which the Supreme Court held that a single-state movement of coal by rail was not part of interstate transportation and therefore was subject to state regulation, because the preceding movement into the state by private rail carriage was not "transportation" within the meaning of the Interstate Commerce Act. The Court reasoned that

> [n]ot all commerce is transportation, and not all transportation is by common carriers by rail. The question for us here is not whether the movement of the coal is to be classified as commerce or even as commerce between states. The question

is whether it is that particular form of interstate commerce which Congress has subjected to regulation in respect of rates by a federal commission.

*Pennsylvania*, 298 U.S. at 174, 56 S.Ct. at 688–89. The Court noted that transportation begins, for the purpose of the Interstate Commerce Act, only when merchandise has been placed in the possession of a common carrier. *Id.* at 175, 56 S.Ct. at 689. Therefore, the movement between states by private carriage could not be tacked onto the single-state for-hire rail transportation to create one continuous interstate movement subject to federal regulation. *Id.* Central argues that here the ICC is impermissibly attempting to create interstate transportation subject to regulation by consolidating parts that are exempt.

The ICC has applied the *Pennsylvania* rationale to determine that it lacks jurisdiction over a single-state motor carrier movement of goods preceded by a movement into the state by private motor carriage. *Motor Transportation of Property Within a Single State*, 94 M.C.C. 541 (1964), *aff'd sub nom Pennsylvania R.R. Co. v. United States*, 242 F.Supp. 890 (E.D.Pa.1965), *aff'd mem. sub nom American Trucking Ass'ns v. United States*, 382 U.S. 372, 86 S.Ct. 533, 15 L.Ed.2d 421 (1966). In *Behnken*, the ICC applied the *Pennsylvania* rationale to determine that it lacked jurisdiction to regulate a single-state motor carrier movement of goods preceded by an unregulated for-hire bulk barge movement into the state. *Behnken*, 103 M.C.C. at 792–97.

We note, however, that the ICC has not applied the *Pennsylvania* rationale to single-state *rail* movements of goods preceded or followed by unregulated for-hire bulk barge movements between states. *See, e.g., Monsanto Co. v. Alton & Southern Ry. Co.*, 339 I.C.C. 319, 322–23 (1971); *Osborne McMillan Elevator Co. v. Minneapolis, St. P. & S.S.M. R.R. Co.*, 306 I.C.C. 155, 158 (1959); *see also James McWilliams Blue Line, Inc. v. United States*, 100 F.Supp. 66, 70 (S.D.N.Y.1951). In each of those cases, the ICC found it had authority to regulate the single-state rail move-

ments, even though the preceding or following barge movements were exempt from its regulation. In those cases, the ICC distinguished *Pennsylvania* on the ground that its holding merely proscribed the tacking of *private* carriage between states onto single-state movements in order to convert the single-state movements into an interstate service. The ICC based this distinction on a possible reason why it did not have jurisdiction over private carriage in the first place: "A private carrier is an arm of the owner's business, which is not true of a contract or common carrier." *Monsanto*, 339 I.C.C. at 321. The ICC gave a policy reason for regulating ex-barge movements: Regulating single-state movements preceding or following for-hire rail or motor transportation in interstate commerce, but not single-state movements preceding or following exempt for-hire barge transportation, would further the competitive inequality that already exists between exempt for-hire barge carriage and carriage subject to ICC regulation. *Id.* at 323. In *Behnken* the ICC did not make this distinction between private carriage and exempt for-hire carriage in the motor carrier context.

In *Victoria III,* the ICC did not refer to its prior cases in which it found it could regulate single-state rail movements of goods preceded or followed by unregulated for-hire bulk barge movements. Rather, the ICC distinguished *Pennsylvania* because of a difference in the statutory language of the original Interstate Commerce Act between rail and motor carrier jurisdiction.

Congress gave the ICC jurisdiction over rail transportation "[f]rom one State ... to any other State," 49 U.S.C. § 1(1) (current version at 49 U.S.C. § 10501(a)), but not over rail transportation "wholly within one State and not shipped to or from a foreign country." 49 U.S.C. § 1(2)(a) (current version at 49 U.S.C. § 10501(b)(1)). This language is somewhat different from the motor carrier provisions quoted above.

The ICC concluded that, based on the difference in statutory language,

the distinction made in the *Pennsylvania* case between "transportation" and "commerce" is necessary in the rail area, but not in the motor area. The statute does not preclude the Commission from licensing and regulating *motor* carriage that is conducted in interstate commerce, even if it does not regulate the transportation at the moment it crosses State lines.

*Victoria III,* slip op. at 2 (emphasis in original).

Although we find *Pennsylvania* distinguishable from the case at bar, it is not because we find the distinction advocated by the ICC to be persuasive. The ICC itself has not always found the *Pennsylvania* distinction between transportation and commerce to be necessary in the rail context, as evidenced by its decisions described above. *See Monsanto,* 339 I.C.C. 319; *Osborne McMillan,* 306 I.C.C. 155.

Rather, we would distinguish *Pennsylvania* on a more persuasive ground the ICC itself has used before. We believe the *Pennsylvania* holding is limited to single-state movements preceded or followed by transportation by *private* carriage. This limitation of the *Pennsylvania* holding furthers the policy considerations recognized by the ICC in cases such as *Monsanto.* It also recognizes that there is a difference between interstate commerce that Congress has chosen not to regulate and transportation that is not interstate commerce at all. We further note that the provision of the Interstate Commerce Act exempting for-hire bulk barge movements did not exist until *after* the Supreme Court decided *Pennsylvania.* Act of Sept. 18, 1940, ch. 722, § 201, 54 Stat. 929, 931. Hence the Supreme Court could not have intended that its decision would apply to unregulated for-hire barge movements. The timing of that provision's enactment strengthens our limitation of the *Pennsylvania* holding. Finally, our decision prevents the creation of a void wherein neither federal nor state regulations can apply. We do not believe Congress would have intended to create such a regulatory void indirectly rather than expressly in the Interstate Commerce Act.

Therefore, we agree with the ICC that VTE's single-state ex-barge movement of fertilizer "is that particular form of interstate commerce which Congress has subjected to regulation in respect of rates by a federal commission." *Pennsylvania*, 298 U.S. at 174, 56 S.Ct. at 689. For these reasons, the petition to review and set aside is DENIED.