921 F.2d 904
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA AND TEAMSTERS
JOINT COUNCIL NO. 7, Petitioner,
Jarvis Leasing, Inc.; The Maxwell Co.; Propane Transport,
Inc.; Truckway Service, Inc.; Weiss Trucking Company,
Inc.; Public Utilities Commission of the State of
California, Petitioners-Intervenors,
v.
INTERSTATE COMMERCE COMMISSION, Respondent,
National-American Wholesale Grocers' Association ("NAWGA");
Superior Transportation Systems, Inc.; James
River Corporation; Interstate
Distributor Company,
Respondents-Intervenors.
CALIFORNIA TRUCKING ASSN., INC.; Regular Common Carrier
Conference; National Motor Freight Traffic Association,
Inc.; New York Motor Carrier Conference, Inc.; Central &
Southern Motor Freight Tariff Association, Inc.; Middle
Atlantic Conference; Middlewest Motor Freight Bureau;
New England Motor Rate Bureau, Inc.; Niagara Frontier
Tariff Bureau; Pacific Inland Tariff Bureau; and Rocky
Mountain Motor Tariff Bureau, Inc., Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
National-American Wholesale Grocers' Association ("NAWGA");
Superior Transportation Systems, Inc.; James
River Corporation; Interstate
Distributor Company; State of
Texas,
Respondents-Intervenors.
 Nos. 88-7313, 88-7324.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 13, 1990.
Decided Dec. 18, 1990.
 
 Patrick McEligot, Rea, Cross and Auchincloss, Washington, D.C., William W. Pugh, Kevin M. Williams, Regular Common Carrier Conference Bd., Alexandria, Va., and Brian L. Troiano, Washington, D.C., for petitioners.
 Michael Martin, I.C.C., Washington, D.C., and Robert B. Nicholson and Laura Heiser, Dept. of Justice, Washington, D.C., for respondents.
 William P. Jackson, Jr. and David C. Reeves, Jackson and Jessup, Arlington, Va., for intervenors.
 Appeal from the Interstate Commerce Commission.
 Before FARRIS and THOMPSON, Circuit Judges, and MUECKE,* District Judge.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and others (collectively "Teamsters") challenge a declaratory order of the Interstate Commerce Commission ("ICC"). The ICC determined that goods shipped from out of state to a warehouse in California, and then shipped from the California warehouse to points within California, continued to be in interstate commerce despite the fact that the final leg of the shipments took place entirely within California. We affirm.
 
 FACTS
 
 2
 James River Corporation of Virginia ("JRC") produces a variety of paper products in several states. In February 1987, JRC began using a new distribution center in Woodland, California ("Woodland center") to distribute three of its major product lines to JRC customers in California.
 
 
 3
 Use of the Woodland center serves several legitimate business purposes. First, use of the center allows JRC to coordinate production and delivery. Because JRC fills orders directly from the Woodland center rather than from each of its 116 manufacturing plants, JRC can combine several different sizes and types of product into truckload shipments, thereby avoiding more expensive, less-than-truckload deliveries. Second, the distribution center allows JRC to switch transportation modes. Shipments arrive at the Woodland center by rail trailer-on-flatcar ("TOF"), boxcar or motor carrier. Products are then shipped to customers within California by motor carrier. The Woodland center facilitates this switch in transportation modes. Finally, utilizing the Woodland center enables prompter response to customer demand.
 
 
 4
 The goods JRC ships to the Woodland center are shipped pursuant to "storage-in-transit provisions." These provisions preserve the application of the contract rates to the traffic, provided that certain specified criteria are met. These criteria include: that the goods move under bills of lading bearing notations of JRC's intent for the goods to be part of a continuing shipment through the Woodland center to JRC's customers; that the goods move beyond the Woodland center to JRC's customers within a designated time after arrival; and that certain records are maintained to establish the relationship between the inbound and outbound movements of the freight. Distribution Specialists, Inc., the distribution company that operates the Woodland center under contract with JRC, maintains the records needed to relate the receipt of a product to the product's outbound movement.
 
 
 5
 JRC uses customers' past buying practices and, to a lesser extent, long-term supply contracts to anticipate the amount of product it needs to ship to the Woodland center. Virtually all shipments move under bills of lading showing JRC as both the consignor and consignee.
 
 
 6
 JRC, Superior Transportation Systems, Inc., and Interstate Distributor Company petitioned the ICC for an order declaring that the shipment of JRC's products from points outside of California to the Woodland center, and from the Woodland center to other points in California, constitutes a continuous interstate movement of the goods. Various parties participated in the ICC proceedings. In July 1988, the ICC determined that the goods were continuously in interstate commerce. Petitions for review were filed. It is these petitions we now consider.[1]DISCUSSION
 
 A. Standard of Review
 
 7
 We may set aside a declaratory order of the ICC only if its findings or conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; or short of statutory right or unsupported by substantial evidence. See 5 U.S.C. Sec. 706(2)(A), (C) & (E); California Trucking Ass'n v. Interstate Commerce Comm'n, 900 F.2d 208, 211 (9th Cir.1990); Gray Lines Tour Co. v. Interstate Commerce Comm'n, 824 F.2d 811, 813 (9th Cir.1987).
 
 
 8
 Teamsters contends we should not give deference to the ICC's determination. Citing Maloley v. R.J. O'Brien & Assoc., Inc., 819 F.2d 1435, 1441 (8th Cir.1987), Teamsters argues that if the courts have special competence in a particular area of the law, then a court need not defer to the agency.
 
 
 9
 In Maloley, the Eighth Circuit held that "[i]f the issue falls outside the area generally entrusted to the agency, and is one in which the courts have a special competence, i.e., the common law or the constitutional law, there is little reason for the judiciary to defer to an administrative interpretation." Maloley, 819 F.2d at 1441 (emphasis added), quoting Hi-Craft Clothing Co. v. NLRB, 660 F.2d 910, 915 (3d Cir.1981). By its terms, Maloley does not apply to this case. Resolution of the question whether goods are or are not in continuous interstate commerce rests squarely within the "area generally entrusted to the agency." We must therefore recognize the agency's presumed competence and expertise and uphold the agency's interpretation so long as it is rationally based. See Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 844-45, 104 S.Ct. 2778, 2782-83, 81 L.Ed.2d 694 (1984).
 
 
 10
 The Supreme Court's recent opinion in Maislin Industries U.S., Inc. v. Primary Steel, Inc., --- U.S. ----, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990), does not, as Teamsters contends, change this result. Maislin established an exception to the usual deference accorded an agency only where the agency's interpretation of statutory language conflicts with well established Supreme Court precedents. Maislin, 110 S.Ct. at 2768. The Court stated: "Once we have determined a statute's clear meaning, we adhere to that determination under the doctrine of stare decisis, and we judge an agency's later interpretation of the statute against our prior determination of the statute's meaning." Id. The ICC ruling here at issue is not "flatly inconsistent with the statutory scheme as a whole" as it was in Maislin. See id. Accordingly, here we will give deference to the ICC's interpretation, barring a showing that the agency exceeded the discretion granted it by section 706(2) of the APA. See Chevron, 467 U.S. at 844-45, 104 S.Ct. at 2782-83.
 
 B. The ICC's Jurisdiction
 
 11
 Teamsters argues the ICC lacked jurisdiction to issue its declaratory order because the transportation in this case is facially intrastate. We disagree.
 
 
 12
 We have held that the ICC has primary authority to interpret the certificates it issues to interstate shippers. California Trucking, 900 F.2d at 211; see also Service Storage & Transfer Co. v. Virginia, 359 U.S. 171, 177, 79 S.Ct. 714, 718, 3 L.Ed.2d 717 (1959). "If the ICC mistakenly treats an intrastate matter as interstate commerce, the defect is substantive rather than jurisdictional." California Trucking, 900 F.2d at 211. "Clearly, to exercise its statutory authority over interstate commerce, the ICC must have, in the first instance, the authority to determine what is interstate commerce." Id. We conclude that the ICC had jurisdiction to determine whether JRC's shipments travel in interstate commerce.
 
 
 13
 C. The ICC's Determination that Shipments Within California Were Still in Interstate Commerce
 
 
 14
 The characterization of transportation between two points within the same state as a continuation of an interstate shipment or as a distinct intrastate shipment depends upon the "essential character" of the shipment. Texas & N.O.R.R. Co. v. Sabine Tram Co., 227 U.S. 111, 122, 33 S.Ct. 229, 233, 57 L.Ed. 442 (1913). "Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment." Armstrong World Indus., Inc., Transportation Within Texas, 2 I.C.C.2d 63, 69 (1986), aff'd sub nom., State of Texas v. United States, 866 F.2d 1546, 1556 (5th Cir.1989) (citing Baltimore & O.S.W.R.R. Co. v. Settle, 260 U.S. 166, 174, 43 S.Ct. 28, 31, 67 L.Ed. 189 (1922)). No set formula exists to determine the shipper's intent. Instead, the shipper's "fixed and persisting intent" must be drawn "from all the facts and circumstances surrounding the transportation." Armstrong, 2 I.C.C.2d at 69.
 
 
 15
 Here, the ICC examined all the relevant circumstances and concluded that JRC at the time of its shipment to the Woodland center in California intended the shipped goods to move in interstate commerce continuously until they reached JRC's California customers. The Commission based this conclusion on several characteristics of the shipments, including the fact that JRC shipped the goods pursuant to storage-in-transit provisions, that JRC shipped the goods pursuant to long-term supply contracts and customers' past buying practices, that the goods remained at the Woodland center for a relatively short period of time and that there existed legitimate business purposes for using the Woodland center as a temporary storage and transfer facility.
 
 
 16
 Notwithstanding the foregoing, Teamsters challenges the ICC's analysis because the ICC did not employ its previously established "Petroleum Products test" to determine the essential nature of the commerce. See Ex Parte No. MC-48, Determination of Jurisdiction Over Transportation of Petroleum and Petroleum Products by Motor Carriers Within a Single State, 71 M.C.C. 17, 29 (1957). Pursuant to the Petroleum Products test, the ICC examines three particular indicators of shipper's intent: (1) the absence of a specific order being filled for a specific quantity at the time of shipment; (2) the status of the terminal storage as a distribution point or local marketing facility; and (3) the arrangement of further transportation only after sale or allocation from storage. Id. Teamsters argues that abandoning the Petroleum Products test in this case was unreasonable as a matter of law, and that the ICC's failure to apply the test, or explain why it did not, was arbitrary and capricious. We do not agree.
 
 
 17
 We have held that where the ICC applies the fixed and persisting intent rule to determine the essential nature of commerce, it need not apply the Petroleum Products test. California Trucking, 900 F.2d at 212. As we said in California Trucking, "Even though the ICC has never explicitly stated that it was abandoning the more structured [Petroleum Products ] test, it appears that its use of that standard has been refined, if not phased out." Id. at 213. We conclude that the ICC did not act arbitrarily, contrary to law, nor did it abuse its discretion in applying the fixed and persisting intent rule to determine the essential nature of JRC's shipments.
 
 
 18
 Teamsters further argues that, even assuming the ICC could properly apply the fixed and persisting intent test to the circumstances of this case, the ICC did so incorrectly. Teamsters argues that existing precedent requires the shipper to know the final destination of goods before it can intend those goods to move continuously in interstate commerce. Because JRC does not know the precise ultimate destination of each unit of product at the time of its initial shipments to the Woodland center, Teamsters asserts that the interstate segment of the shipment must end upon each product's arrival at the Woodland center. In support of this argument, Teamsters relies on Atlantic Coast Line R.R. Co. v. Standard Oil of Kentucky, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927).
 
 
 19
 The ICC distinguished Atlantic Coast Line. It explained that the stored goods in Atlantic Coast Line were not intended for particular customers, but were merely placed in storage for convenient later delivery once customers materialized. JRC, on the other hand, ships goods to the Woodland center based on specific anticipated demands of JRC's customers drawn from their past ordering practices and long-term supply contracts. The ICC determined that JRC ships none of the goods with only an indefinite expectation that at some undetermined time in the future a buyer might materialize.
 
 
 20
 The ICC also distinguished Atlantic Coast Line on the ground that the shipper in Atlantic Coast Line did not ship the goods pursuant to a storage-in-transit agreement. Here, JRC makes all of its shipments pursuant to storage-in-transit agreements.
 
 
 21
 Finally, the ICC has held in other cases that the shipper need not know the exact identity of particular consumers in order to intend that the goods move continuously in interstate commerce. Central Freight Lines v. ICC, 899 F.2d 413, 421 (5th Cir.1990); Railroad Comm'n of Texas v. Oil Field Haulers Ass'n, Inc., 325 I.C.C. 697, 701 (1965) ("Merely because the exact identity of a particular consumer is unknown is of no moment."). Atlantic Coast Line thus does not conflict with the ICC's determination of the interstate character of JRC's shipments.
 
 
 22
 Teamsters' reliance on Surles Contract Carrier Application, 4 M.C.C. 488 (1938), an ICC case, is similarly misplaced. In Surles, the ICC concluded that a shipment from a warehouse in Texas to other points in Texas was intrastate in character, notwithstanding the fact that the goods had come from an out-of-state source. The ICC determined that the out-of-state shipper's intent to distribute the merchandise at some future time did not establish the essential continuity of movement required to make the second leg of the transportation interstate in nature. Id. at 494.
 
 
 23
 Since its decision in Surles, the ICC has determined that the significant factor in Surles was that the shipper did not use a storage-in-transit provision. See Central Freight, 899 F.2d at 422. Here, JRC's inclusion of a storage-in-transit provision in its contracts with the carriers evidences a more specific intent to ship the goods in interstate commerce. Indeed, the ICC found that the storage-in-transit provision used by JRC is strikingly similar to the provision which the court in State of Texas v. United States, 866 F.2d 1546 (5th Cir.1989), found reflective of the shipper's intent of a continuing interstate movement.
 
 
 24
 Teamsters objects to the ICC's reliance on what Teamsters characterizes as the self-serving nature of JRC's storage-in-transit provision. Teamsters argues that the storage-in-transit provision makes absolutely no sense from a business or transportation point of view because the carriers do not give JRC the benefit of through rates from the out-of-state origins to destinations in California beyond the Woodland center. Teamsters points out that the inbound and outbound carriers act independently of one another, and charge JRC the combination of their local rates to and from the Woodland center. Teamsters contends that because no legitimate business purpose for the storage-in-transit provision exists and the carriers do not supply a "through rate", the provision is meaningless when used to determine whether the goods move in interstate or intrastate commerce.
 
 
 25
 We do not find Teamsters' argument persuasive. First, as the court noted in Central Freight, a "through rate" may be "a combination of separately established rates." Central Freight, 899 F.2d at 422 (citing 49 C.F.R. 1312.1(b)(37) (1989)). Second, the temporary storage of goods at the Woodland center does serve legitimate business purposes. Use of the Woodland center allows JRC to coordinate delivery of its products, ensures that all products needed by a customer are available for delivery together and provides an efficient opportunity to convert means of delivery from rail shipments to truck delivery. Finally, Teamsters' argument overlooks the fact that the significance of the storage-in-transit provision is that it sheds light on the shipper's intent. See id. at 422. The ICC has held that the storage-in-transit privilege may effectively convert what otherwise would be a separate movement into part of a through interstate movement by tying movements together into a continuing service. Oil Field Haulers, 325 I.C.C. at 701. We conclude that the ICC did not err in giving probative weight to JRC's storage-in-transit provision in its determination of shipper's intent.
 
 
 26
 Our conclusion does not, as Teamsters warns, allow shippers to convert movements within a single state into interstate shipments merely by denominating a break between two legs of a movement "storage-in-transit." In Central Freight, the Fifth Circuit recognized that if the storage-in-transit provision only required a stamp at the point of initial shipment, the shipper would have an incentive to stamp the shipment as storage-in-transit regardless of its true intent regarding the final destination of the goods. Central Freight, 899 F.2d at 422. In Central Freight, however, the court noted that the storage-in-transit provision at issue contained other requirements which ensured that the shipments were part of a continuous movement. Id.
 
 
 27
 JRC's storage-in-transit provision contains almost identical terms to those emphasized in Central Freight. All of JRC's products move to and from the Woodland center on JRC's bills of lading. Both inbound and outbound bills contain notations tying the shipments together by use of the storage-in-transit provision. The provision accords transit privileges only to those products held less than one year at the Woodland center. The outbound carrier has the right to examine JRC's records to verify that the goods tendered are, in fact, properly documented goods still in interstate transit. Finally, all of the goods held at the Woodland center have separate and distinct stock-keeping unit numbers, which ensures that out-of-state goods will not be commingled with California-produced products. Rather than operating as a mere stamp that the second leg of the trip is interstate, the terms of the storage-in-transit provision ensure that there exists a legitimate business purpose for the provision, and that JRC intends that the goods travel in interstate commerce.
 
 
 28
 D. Single-State Movements Preceded by Exempt Movements
 
 
 29
 Approximately 15% of JRC products shipped to the Woodland center arrive by rail boxcar or TOF shipments. The ICC has chosen to exempt these shipments from most regulatory requirements pursuant to 49 U.S.C. Sec. 10505. Teamsters argues that shipments from the Woodland center, preceded by exempt shipments, must be deemed to be new shipments from the Woodland center. Teamsters argues that this is so regardless of JRC's intention to transport its merchandise in continuous interstate commerce. We disagree, and hold that goods shipped from a point in one state to a point in the same state may remain in interstate commerce even where an exempt movement of the goods precedes the single-state movement.
 
 
 30
 We begin with the observation made by the Fifth Circuit in Central Freight that "[i]f the essential character of the transportation, as determined primarily by the shipper's intent, is interstate, we do not see how that interstate character changes when one leg of the journey is performed by a carrier that happens to be exempt from ICC regulation." See Central Freight, 899 F.2d at 423. The ICC's exemption from regulation of rail boxcar and TOF shipments does not affect JRC's "fixed and persisting intent at the time of shipment." Armstrong, 2 I.C.C. 2d at 69. Moreover, while the ICC has exempted TOF and boxcar transportation from its active control, such service is still "subject to" Commission regulation. See 49 C.F.R. Sec. 1039.14 (1988). The ICC could reassert its regulatory authority over such traffic merely by revoking the exemption. See G & T Terminal Packaging Co. v. Consolidated Rail Corp., 830 F.2d 1230, 1235 (3d Cir.1987), cert. denied, 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 501.
 
 
 31
 The decision of the ICC is AFFIRMED. The petition for review is DENIED.
 
 
 
 *
 Honorable C.A. Muecke, Senior United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 JRC argues that our decision in California Trucking Ass'n v. Interstate Commerce Comm'n, 900 F.2d 208 (9th Cir.1990), collaterally estops the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America and the State of Texas from raising certain issues before this court. Because other parties to these proceedings properly raise these issues, however, we do not consider JRC's issue preclusion argument